**James D. HODGSON, Secretary of Labor**

**v.**

**MAISON MIRAMON, INC. et al.**

**Civ. A. No. 70-3373.**

United States District Court,
E. D. Louisiana.

June 5, 1972.

Murray A. Battles, U. S. Dept. of Labor, Birmingham, Ala., for plaintiff.

David E. Cooley, Jr., Fritchie, Cooley & Guth, Slidell, La., for defendants.

## OPINION

R. BLAKE WEST, District Judge.

Pursuant to statutory authority conferred by 29 U.S.C. § 206(d) and § 217, the Secretary of Labor brought this action to enjoin the defendants, Greenbriar Nursing Home, Inc. and its officers, from violating the equal pay provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 206 et seq. (the Act). The Secretary maintains that Greenbriar employs male orderlies and female nurses' aides, who perform substantially the same work,

but are paid different wages. It is undisputed that orderlies are paid approximately twenty to thirty cents an hour more than the aides; the Secretary contends that these wage differentials are in violation of 29 U.S.C. § 206(d) (1), in that they are not based upon a factor other than the sex of the defendants' employees, and that, in accordance with the requirements of the Act, the female aides are entitled to the same salaries paid the male orderlies. To remedy the alleged violations, the Secretary seeks by injunction to require compliance by defendant nursing home and its officers with the equal pay provisions of the Act and to require defendants to pay additional wages due female employees which have accrued from September 25, 1969.

In light of the Court's factual determinations and the applicable legal authorities, it is the Court's opinion that defendants have violated the equal pay provisions of the Act. Accordingly, plaintiff's requested injunctions against defendants are granted.

### Nursing Home Operations

Defendant Greenbriar Nursing Home, Inc. (formerly Maison Miramon, Inc.) is a privately owned nursing home located in Slidell, Louisiana, which, in the main, houses geriatric patients, predominantly women [1], requiring custodial care or convalescing from illness or injury. Incorporated in Louisiana, Greenbriar began doing business on September 22, 1969 [2]. Defendants Louis G. Miramon, Jr. and Louis F. Huesmann, are officers and shareholders of the defendant corporation, and, in such capacity, actively supervise, manage and direct the business affairs and operations of Greenbriar.[3]

1. At the time of the Greenbriar investigation by the Wage and Hour Division of the Department of Labor, there were forty-one female and thirteen male patients.

2. The Corporation admits that it is an "enterprise engaged in commerce or in

production of goods for commerce" within the meaning of Sections 203(r) and 203 (s) (4) of the Act.

3. Louis G. Miramon, Jr. is the Chairman of the Board of Maison Miramon, Inc.; Charles F. Huesmann is the Administrator of Greenbriar Nursing and Convalescent Home. Both of these defendants

The home is constructed of two wings, each of which has thirty semi-private bedrooms with connecting baths. There is a central lobby, as well as a large patio area immediately in front of the building. The home also has a large back lobby, dining and kitchen facilities, and laundry and storage rooms.

To accommodate the residents on the Greenbriar premises, the home is staffed twenty-four hours a day, seven days a week, on a three-shift basis. A registered or practical nurse is in charge of each shift.

From its inception, the home has employed female nurses' aides and male orderlies to assist in the care of the Greenbriar patients. The aides and orderlies are generally responsible for the personal care and comfort of the Greenbriar patients and are usually assigned to the care of female and male patients, respectively. The basic duties of each include the feeding of patients, brushing and combing of their hair; making beds; changing, turning, and lifting patients; securing and emptying bed pans; and assisting patients in and out of bed. When needed, and as available, the aides and orderlies assist each other.

The number of aides and orderlies on duty at a given time varies according to shift. Although there is generally one orderly on duty at all times, the number of aides working on a shift ranges from two aides on the night shift to four or five aides on the day shift.[4] However, there is no salary differential based upon the shift worked by an employee; uniformly, the orderlies receive higher salaries than the aides. At issue is the Secretary's contention that the aides should be paid the same salaries as the orderlies, because they do equal work.

admit that they are "employers" within the meaning of Section 203(d) of the Act.

4. At Greenbriar, there appear to be numerous shifts, with the three major shifts as follows: the day shift (7:00 a. m.—

*The Law*

Section 206(d) (1) of 29 U.S.C. provides:

"No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex; *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

In equal pay disputes, it is well-established that the Secretary bears the burden of proving that male and female employees perform equal work, but receive unequal compensation. If the Secretary sustains this burden, then the burden of proof shifts to the defendant to prove that some criteria existed for wage discrimination other than the sex of the employees. See Shultz v. Wheaton Glass Co., 421 F.2d 259 (C.A. 3, 1970), cert. den., 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970); Shultz v. First Victoria National Bank, 420 F.2d 648 (C.A. 5, 1969).

3:00 p. m.), the evening shift (3:00 p. m.—11:00 p. m.), and the night shift (11:00 p. m.—7:00 a. m.). There are no statistics regarding the exact number of aides and orderlies working each shift.

The Act sets out four determinative factors to be used in deciding whether male and female employees must be paid the same wage: equal skill, responsibility, effort, and similarity of working conditions. Defendants concede that the duties of its aides and orderlies require equal skill and responsibility, but maintain that the roles of the aides and orderlies are distinguishable in terms of effort and working conditions, in that the orderlies perform additional duties, not called upon or undertaken by the aides.

In determining whether job duties entail "equal effort", this Court is bound to follow the rather stringent guidelines promulgated by the Fifth Circuit and to set out "thorough and specific" findings of fact based on those guidelines. Speaking for the Court of Appeals, Judge Ainsworth, in Hodgson v. Brookhaven General Hospital, (C.A. 5, 1970), 436 F.2d 719, 725, stated that:

". . . jobs do not entail equal effort, even though they entail most of the same routine duties, if the more highly paid job involves additional tasks which (1) require extra effort, (2) consume a significant amount of the time of all those whose pay differentials are to be justified in terms of them, and (3) are of an economic value commensurate with the pay differential."

## Trial Testimony

■ A non-jury trial was held primarily to determine whether the work done by the male and female Greenbriar employees involves equal effort and is performed under similar working conditions. The wages paid the Greenbriar employees were not in dispute.[5] Numerous witnesses were called by the Secretary and the defendants to explain the nature of the work done by the aides and orderlies.[6] The testimony was both repetitious and inconsistent; the statements made by a majority of the witnesses were obtrusively self-serving. The witnesses for the Secretary, and particularly the aides, were anything but reticent. However, from all the evidence presented, it is the opinion of the Court that the Secretary sustained his burden of proving that the work being performed by the aides and orderlies involves the same amount of effort, and is performed under similar working conditions.

It is clear from all the testimony that a substantial portion of the duties of the aides and orderlies at Greenbriar is the taking care of the personal needs of the female and male patients, respectively. However, as stated, the defendants maintain that the orderlies perform tasks—over and above routine patient care—which require additional effort. Accordingly, witnesses for the Secretary stressed the physical difficulties involved in the aides' duties. The aides testified that they, as well as the orderlies, lift patients and move heavy equipment such as oxygen tanks, carry laundry and arrange furniture in the patients' rooms. One aide stated that she cleaned windows, mopped, scrubbed, and waxed floors. All of the aides participate in some mopping activities made necessary by patients' incontinence or faulty operation of bathroom facilities. In fact, most aides explicitly stated that their labors are more demanding than their male counterparts, since they have proportionately more patients to assist than do the orderlies.

The orderlies testifying on behalf of the Secretary generally corroborated the testimony of the aides. Although acknowledging that they perform extensive mopping activity in the dining and kitchen areas, the orderlies stated that

5. From the records supplied by Greenbriar, it is clear that the starting aide salaries were $1.30, $1.45, and $1.60, while the starting orderly salaries were, for the same periods, $1.60, $1.70, and $1.80. (See Appendices B and C.)

6. In order to support the "thorough and specific" findings of fact required by *Brookhaven, supra* at 725, a summary of the testimony of each witness is listed in Appendix A.

the aides perform virtually the same tasks as the orderlies. Also, there was testimony to the effect that the care of female patients is more difficult than the care of male patients, the females being generally less independent and more frequently in need of care.

To support its position that orderlies perform more strenuous duties than the aides, defendants presented the testimony of several male employees and nurses. The male employees testifying for defendants stated that, in addition to spending a great deal of time with the male patients, their activities also include delivering and returning patients to and from the home; returning patients who wander out of the building; moving heavy equipment; putting side rails on beds; assisting in post-mortem care; maintenance; operating floor buffers and mopping floors; changing air conditioning filters; cleaning up the dining area; unloading and storing supplies, providing security and protection for aides and patients; mowing grass; and hosing and sweeping the garage and patio. However, the amount of time spent by the orderlies on non-patient care varies. One orderly stated that he spends three out of eight hours a day on janitorial duties. The full-time janitor testified that orderlies spend only one and a half to two hours per shift on janitorial work.

Several nurses, testifying on behalf of defendants, disputed the complaints of heavy duty work done by the aides, and stated that the aides are given explicit instructions not to perform heavy duty jobs such as lifting patients or mopping floors and that they are instructed to call an orderly for assistance in performing any heavy work.

The defendants placed in evidence a job description list which detailed the manual labors required of the Greenbriar orderlies. In addition to describing routine patient care duties, the description list provides that the orderlies are to assist the janitors with janitorial work. Included in these janitorial duties are the following tasks: picking up dirty dishes, cleaning the men's bathroom, mopping and buffing the halls and kitchen, and hosing the carport. However, in evaluating the work activities of the Greenbriar employees, the Court should and did focus its attention upon the "job content" of the Greenbriar employees, and not job activities as reflected in manuals or general nursing directives. See *Brookhaven General Hospital, supra*, at 724. Of paramount importance are the actual tasks undertaken by the aides and orderlies. Cf., 29 C.F.R. § 800.121 (1970).

The inconsistent and conflicting nature of the trial testimony regarding the work done by the aides and orderlies, and the obvious self-interest of most of the witnesses, has made the Court's fact-finding process difficult. Compliance with the strict guidelines enunciated in *Brookhaven* has been an awkward task. However, this Court holds, on the basis of the factual evidence, that the duties performed by female aides at Greenbriar involve the same amount of effort and are performed under working conditions similar to those of the male orderlies within the meaning and intent of the Act. The predominant duties of each involve patient care of the Greenbriar residents. The Court recognizes that some of the orderlies perform additional manual tasks, not performed by the aides, and that these non-routine patient care activities consume as much as one to two hours per shift. A variation of testimony in this matter, and an overlapping of functions by the various male employees makes it difficult to define precisely the work activities of the orderlies. However, to the extent that some orderlies do perform some functions requiring more physical exertion than the aides can provide, this Court holds, as a further finding of fact, that these added labors do not consume a significant amount of the orderlies' time and do not merit a salary commensurate with the increased wage received by the orderlies.

Defendants contend that the orderlies' performance of manual labors calls for

the higher wage; but defendants are not altogether consistent in this position. For example, janitors, all of whom are males whose duties exclusively involve manual labor, are paid the same rate, no higher or lower, as orderlies, who primarily perform patient-related services. The absence of non-routine patient care duties on the part of the janitors has not served to lower the salary of these employees; and it cannot be a basis for lowering the salary of female employees. The Court can only conclude that the discrimination in pay scales of Greenbriar employees is based on the sex of its employees and is not related to different job duties with different economic values.

This Court's finding that the aides and orderlies perform equal work is consistent with holdings of other district courts. In recent months, nursing homes have been quite vulnerable to charges by the Secretary of Labor that male and female employees perform equal work functions at unequal wages. Hodgson v. Meharry Medical College d/b/a Hubbart, 66 LC 32, 572 (M.D. Tenn.1971); Hodgson v. Lancaster Osteopathic Hospital Ass'n., Inc., 66 LC 32, 543 (E.D.Pa.1971); Hodgson v. McMurray Hills Manor, 66 LC 32, 589 (W. D.Pa.1971); Hodgson v. Golden Isle Nursing Home, Inc., 64 LC 32, 445, (S. D.Fla.1971); Hodgson v. The Good Shepherd Hospital, 65 LC 32, 500 (E.D. Tex.1971); Hodgson v. William & Mary Nursing Hotel, 65 LC 32, 497 (M.D.Fla. 1971). By and large, attempts to differentiate between the job duties of the aides and orderlies have been unsuccessful. Efforts to distinguish the work loads of the male and female employees ultimately focus upon the existence *vel non* of added manual labor done, or skills possessed, by the orderlies. However, "employers may not be permitted to frustrate the purposes of the Act by calling for extra effort only occasionally or only from one or two male employees . . . ." Hodgson v. Brookhaven General Hospital, *supra,* 436 F.2d at 725.

In the present case, an inordinate amount of the testimony and legal argument presented by counsel for the respective parties stressed the amount of floor mopping done by the Greenbriar employees. Fine distinctions between floor mopping and spot mopping were drawn in an effort to prove that aides and orderlies perform different activities. However, such distinctions fall short of the Act's statutory intent. This Court is unable to state conclusively that all nursing home aides and orderlies perform equal tasks requiring equal pay; nevertheless, an examination of existing case law illustrates the fact that wage discriminations must be based upon "bona fide job classification[s]." U.S. Code Cong. & Admin. News, 88th Congress, First Session 1963, Vol. 1 at p. 689. Legitimate job differences have been shown to exist only in cases where the orderlies perform services of a more skilled or technical nature than the mere grooming and caring for patients. In *Golden Isle Nursing Home, The Good Shepherd Hospital,* and *William & Mary Nursing Hotel, supra,* in which the Courts allowed male orderlies to receive a higher compensation than their female counterparts, the orderlies performed skilled duties which included catheterization, setting up tractions and oxygen tents, and inhalation therapy. More additional training and know-how were required of the orderlies than of the aides who did not perform these duties.

The Court having concluded that the Secretary has met his burden of proving equality of work and that an inequality of pay existed among the Greenbriar employees, the defendants now have the burden of showing that the wage differential paid its employees is based on a factor other than sex. From the testimony and from the exhibits filed of record, the Court holds that defendants have not met this burden.

The equal pay provisions provide that wage discrimination by an employer is permissible if made pursuant to a seniority system, a merit system, a system which measures earnings by quantity

and quality of production, or a differential based on any factor other than sex. The evidence in this case preponderates against the possibility that the wage differential paid the Greenbriar employees was based on any of the stated exceptions.

The defendants admit that none of the following factors was considered in the setting of salaries of its employees; prior experience, education, age, marital status, dependency, or number of patients. Also, defendants acknowledge that training programs and incentive pay did not play a role in the setting of wages. Rather, defendants assert that pay differentials were based upon seniority systems, merit promotions, and a system measuring earnings by quantity and quality of work production. However, the Court's factual findings do not support this view.

At no time were the wages paid the female aides on a par with the male orderlies. Testimony of Charles F. Huesmann, the Greenbriar administrator, revealed that aides uniformly started working at a salary equal to the existing minimum wage, while the orderlies uniformly began working at salaries substantially above the existing minimum wage.

The minimum wage scale, and corresponding starting aide salary was as follows:[7]

| Effective | 2/1/69 | $1.30 |
|---|---|---|
| | 2/1/70 | 1.45 |
| | 2/1/71 | 1.60 |

However, the starting orderly salary varied from $1.60 to $1.90, always with at least a $.25 increment above the existing minimum wage.[8] Thus, orderlies hired in 1969 started at a rate of $1.60, those hired in 1970 started at a rate of $1.70, and those hired in 1970 started at a rate of $1.80.

John C. Davis, a compliance officer for the Wage and Hour Division of the United States Department of Labor, testified that he had met with Mr. Huesmann regarding the duties and salaries of the Greenbriar employees. According to Mr. Davis, Huesmann's explanation for paying orderlies more than aides was simply that there was an abundance of female labor available to work at the minimum wage, but that it was almost impossible to find men to work at the minimum wage.

Defendants did not prove that the wage differentials were justified. As previously stated, contentions that wage differences are based upon work differences have been refuted. Also, contentions that salaries are paid pursuant to seniority and merit promotions are not well-founded. All promotions given the aides were to comply with minimum wage requirements; and all promotions given to orderlies were merely attempts to keep the services of the orderlies by maintaining their wages above those wages paid the aides. In short, defendants have not met their burden of proving the existence of a valid reason for the wage discriminations within the intent and meaning of the Act.

### Remedies

It is unquestioned that at all relevant times defendant nursing home paid to nurses' aides the national minimum wage. It is clear to the Court that defendant paid its orderlies more than its nurses' aides because of the operation of what was once considered a relatively free-market economy, i. e., defendants could obtain the services of nurses' aides at the minimum wage, but were required by the law of the labor market place to pay more than the minimum wage to obtain and keep the services of orderlies.

However, the Fifth Circuit has made it clear that ". . . the fact that the employer's bargaining power is greater with respect to women than with respect to men . . ." does not constitute a fact in determining the applica-

---

7. See Appendix B for a list of aide salaries.

8. See Appendix C for a list of orderly salaries.

bility of one of the statutory exceptions to the Equal Pay Act for pay differentials attributable to factors other than sex. Hodgson v. Brookhaven General Hospital, *supra*, at 726.[9]

As the Greenbriar aides performed work duties equal to those performed by the orderlies, they are entitled to be paid wages equal to their male counterparts. The defendants, therefore, are hereby enjoined and restrained from further violating the equal pay provisions of the Fair Labor Standards Act by paying female aides at Greenbriar salaries lower than salaries paid male orderlies at Greenbriar. See Goldberg v. Cockrell, 303 F.2d 811 (C.A.5, 1962); Goldberg v. Mathews, 303 F.2d 814 (C.A.5, 1962).

■ Also, defendants are enjoined from withholding past wages due the aides from September 25, 1969. Wages not paid because of sex discrimination are deemed unpaid minimum wages, 29 U.S.C. § 206(d) (1), (3), for which injunctive action is appropriate, 29 U.S.C. § 217.

The Secretary is directed to compute the amount of unpaid wages and to prepare a decree in conformity herewith, submit the same to counsel for the defendants, and then to the Court for entry of judgment.

### APPENDIX "A"

The following is a summary of the testimony given by the Greenbriar employees:

1. Mrs. Charlotte Sears: Mrs. Sears, who is no longer working for Greenbriar, was hired by the nursing home when it first opened in September, 1969. She had previous experience working at nursing homes and dealing with the aged and infirm, and began working at $1.30 per hour, the then existing minimum wage. She stated that her duties at Greenbriar included the following: bathing patients; feeding patients; giving whirlpool baths; taking temperatures, blood pressures, and pulse readings. This witness stated that the average patient is so helpless that handling by two aides or orderlies is necessary.

The witness stated that the orderlies were charged with the care of the men patients; however, if the orderlies did not come in, then the aides had to take care of the male patients. She said that the extra duties of the orderlies consisted of cleaning off the dining tables, which took about forty minutes per shift.

Mrs. Sears stated that the aides sometimes mopped the floors to clean up after a patient. She stated that the nurse on duty had told her not to mop, but that the aides were forced to mop the area because of a shortage of janitors on duty.

2. Hattie Mills: This witness began working for Greenbriar when the home first opened. She initially performed housekeeping duties, but later worked as a full time aide. She stated that her duties as aide consisted of the following: bathing patients, assisting them with feeding, walking them, taking patients' pulse readings. She also stated that, as an aide, she mopped and scrubbed the floors, and cleaned the windows. As heavy duty work, the witness testified that she moved beds from one room to another, arranged furniture and moved oxygen tanks, put side rails on beds, and did laundry work.

---

9. It is instructive to note in passing, however, that the Government's success in this suit, although it will constitute what might aptly be termed a windfall to certain of defendant's former and present employees, will likely cause the nursing home to cease its operations and thus throw *all* of its present employees, male and female, on a perfectly equal basis, into the world of the unemployed. Thus, well-intentioned, but unrealistic, social legislation may well in this case have as its end result a wholly undesirable economic effect.

The witness also stated that she, under the supervision of a nurse, removed bandages and cleaned wounds. Additionally, the witness said that she drove patients various places in her own car.

Mrs. Mills complained that sometimes there were no orderlies to assist the aides, and that the orderlies did not perform any heavy activities.

3. Shirley Scott: Miss Scott was also employed by Greenbrier when it first opened. She stated that the general duties of the aides consisted of the following: getting patients up in the morning, dressing them, feeding them, and giving them baths. The aides assisted in irrigations, but not catheterizations. Additionally, the witness stated that she swept out rooms, dusted the furniture, and even mopped some floors. When the orderlies did not come in for work, the aides had the responsibility of taking care of the male patients. Miss Scott stated that the aides had to lift heavy patients, and move beds when the orderlies were not present.

Finally, Miss Scott stated that the jobs of the aides were more difficult than the jobs of the orderlies in that the men do not require as much personal attention as the women. She stated that the aides had more patients to care for than the orderlies.

4. Zenobia Harrison: This witness worked part time for Greenbrier as an aide. She stated that her main duties consisted of dressing and undressing the patients. She helped clean the patients' laundry, and assisted in the dining areas, but she stated that she did not dust furniture or wash windows.

Counsel for the respective parties entered into a stipulation that the following witnesses, who did not take the witness stand, would testify in a manner substantially similar to the first four witnesses:

Alberta Terrell

Earnestine Jackson

Ellen Cox

Marjorie Doyle

Pearl Wallace

5. Leroy Pierre: Pierre, no longer employed by Greenbriar, worked as an orderly. He stated that his duties included the following care for the male patients: getting the patients out of bed, dressing them, bathing them. Additionally, Pierre stated that he performed substantial cleaning tasks for the nursing home such as mopping areas of the hospital, cleaning the dining room tables. He stated that he spent about an hour a day on non-patient-care activities. Pierre stated that he did not cut the grass or wax the floors, but that he did buff the halls a couple of times.

Pierre stated that the aides and the orderlies perform substantially the same duties: he does not know of any duties performed by the orderlies that were not performed by the female aides. The witness stated that the orderlies slept a great deal more on the job than the aides.

6. Julius Lester: This witness worked as an orderly a couple of times a week on the night shift. Although he worked mainly as an orderly, he sometimes worked as a janitor. He stated that his duties included the following: dressing the patients, getting them ready for breakfast, making their beds, giving them baths.

Lester's wife also worked for Greenbriar; he stated that she, and the aides had more work to do than the orderlies. The aides had more female patients to care for than the orderlies.

7. Marvin Twillie: Twillie worked various shifts at Greenbrier. Classified as an orderly, he spent two of

six days working as a janitor. He stated that his principal duties involved the taking care of the male patients, answering the lights, and changing the patients.

Twillie stated that the aides did not have much time to devote to non-patient care activities because they had so many patients to assist. The witness did state that the janitor's job is more strenuous than an orderly job, but that the same wages were paid to janitors and orderlies.

8. Virgil Williams: Williams did janitorial work as well as orderly duties. He stated that five of eight hours were spent caring for the patients. He listed his non-patient activities as follows: Mopping, buffing, changing air conditioning filters, cleaning tables, cutting grass, sweeping the porch, returning patients who wandered out of the building, and general maintenance activities.

9. Joe Allen: Allen was hired as an orderly, but now works as a full time janitor. He still does a little patient care. He stated that the orderlies spend from an hour and a half to two hours a day on janitorial duties. Allen also testified that some of the aides do janitorial work themselves, such as moving furniture and arranging chairs.

10. Larry Duncan: Duncan worked as an orderly and a janitor. His duties included sweeping and mopping the floor, and unloading supplies. Duncan testified that his duties were more difficult than some orderly activities as lifting patients. He stated that he spent about half his time on janitorial duties.

11. Joyce Barragon: Miss Barragon was a registered nurse, who worked as a relief nurse at Greenbriar. She stated that she felt uneasy working without an orderly, but also admitted that the absence of an orderly on duty did not have any effect on the patients.

12. Helen G. Rotondo: Miss Rotondo is a nurse presently employed by Greenbriar. She stated that she told aides on her shift not to use mops or to lift heavy patients. She stated that the orderlies on her shift spend about five hours a day taking care of the male patients, and about three hours a day doing janitorial duties. She stated that she does not feel that she could handle her shift effectively without an orderly.

13. Mary Sigler: Miss Sigler, a registered nurse, is the Director of Nurses at Greenbriar. Her job entails the supervision of the aides and the orderlies. She stated that the aides and the orderlies did perform different duties, as evidenced by mopping activities. The aides simply "spot mopped" floor spills, whereas the orderlies mopped the entire nursing home. She stated that the janitors, alone, pick up chairs and sweep the home area.

Finally, Miss Sigler stated that the male employees actually do more than their testimony at trial would indicate. She listed the following extra duties performed by the orderlies: unpacking large boxes, putting in supplies, taking patients to and from doctors' offices. She stated that orderlies and janitors in nursing homes, as opposed to hospitals, should not be regarded as separate categories.

APPENDIX "B" *

The following is a list of aides employed by Greenbriar Nursing Home, Inc. from September, 1969 until April, 1971.

| NAME | SEX | HIRING DATE | HIRING RATE OF PAY | PAY INCREASES, DATE, AND REASON | CURRENT RATE |
|------|-----|-------------|--------------------|---------------------------------|--------------|
| Charlotte Sears | F | 9/18/69 | $1.30 | 15¢ 2/1/70 min. wage<br>15¢ 2/1/71 min. wage | $1.60 |
| Lola Sylve | F | 10/ 2/69 | 1.30 | 15¢ 2/1/70 min. wage | Unemployed |
| Shirley Scott | F | 9/18/69 | 1.30 | 15¢ 2/1/70 min. wage | Unemployed |
| Marjorie Doyle | F | 9/18/69 | 1.30 | 15¢ 2/1/70 min. wage<br>15¢ 2/1/71 min. wage | $1.60 |
| Mary Miles | F | 9/18/69 | 1.30 | 15¢ 2/1/70 min. wage | Unemployed |
| Maggie Evans | F | 9/18/69 | 1.30 | 15¢ 2/1/70 min. wage<br>15¢ 2/1/71 min. wage | $1.60 |
| Hattie Mills | F | 9/18/69 | 1.30 | 15¢ 2/1/70 min. wage<br>15¢ 2/1/71 min. wage | $1.60 |
| Earnestine Jackson | F | 3/26/70 | 1.45 | None | Unemployed |
| Cynthia Lester | F | 9/ 3/70 | 1.45 | 15¢ 2/1/71 min. wage | $1.60 |
| Virgie Peters | F | 6/ 9/70 | 1.45 | 15¢ 2/1/71 min. wage | $1.60 |
| Alberta Terrell | F | 5/11/70 | 1.45 | None | Unemployed |
| Pearl Wallace | F | 1/ 8/70 | 1.30 | 15¢ 2/1/70 min. wage<br>15¢ 2/1/71 min. wage | $1.60 |
| Zenobia Harrison | F | 2/ 5/70 | 1.45 | None | Unemployed |
| Mildred Robinson | F | 10/ 9/70 | 1.45 | None | Unemployed |
| Helen Hartley | F | 7/28/70 | 1.45 | None | Unemployed |
| Neorlean McMooain | F | 8/28/70 | 1.45 | None | Unemployed |
| Hilda Graves | F | 10/ 8/70 | 1.45 | 15¢ 2/1/71 min. wage | $1.60 |
| Gertrude Pierre | F | 2/18/70 | 1.45 | None | Unemployed |
| Ellen Cox | F | 3/ 5/70 | 1.45 | None | Unemployed |
| Ursula Ray | F | 2/24/71 | 1.60 | None | $1.60 |
| Daisy Loyd | F | 1/ 1/71 | 1.45 | 15¢ 2/1/71 min. wage | $1.60 |
| Virgie Owens | F | 1/ 1/71 | 1.45 | 15¢ 2/1/71 min. wage | $1.60 |
| Shirley Wright | F | 2/ 4/71 | 1.60 | None | Unemployed |
| Dooshie Moore | F | 9/28/69 | 1.30 | None | Unemployed |

\* These statistics were provided by defendant Greenbriar Nursing Home, Inc.

APPENDIX "C" **

The following is a list of orderlies employed by Greenbriar Nursing Home, Inc. from September, 1969 until April, 1971:

| NAME | SEX | HIRING DATE | HIRING RATE OF PAY | PAY INCREASES, DATE, AND REASON | CURRENT RATE |
|------|-----|-------------|--------------------|---------------------------------|--------------|
| Virgil Williams | M | 9/18/69 | 1.60 | | Janitor now |
| Edward Smith | M | 9/18/69 | 1.60 | 10¢ 2/ 6/70 | unemp. |
| Leroy Pierre | M | 9/18/69 | 1.60 | 10¢ 2/ 6/70<br>10¢ 3/19/71 | $1.80 |
| L. K. Robinson | M | 9/18/69 | 1.60 | 10¢ 2/ 6/70 | unemp. |
| Victor Furman | M | 9/18/69 | 1.60 | None | unemp. |
| Tommy Jones | M | 4/24/70 | 1.70 | None | unemp. |
| Louis Jones | M | 1/19/70 | 1.60 | 10¢ 2/ 6/70 | unemp. |
| Clarence Singletary | M | 3/28/70 | 1.70 | None | unemp. |
| Otis Green | M | 6/23/70 | 1.70 | None | unemp. |
| Dennie Irvin | M | 9/28/70 | 1.60 | None | unemp. |
| Juluis Lester | M | 10/23/70 | 1.60 | 10¢ 3/19/71 | $1.70 |
| Steve Baragona | M | 8/23/70 | 1.60 | 12/ 1/70  10¢<br>3/19/71  10¢ | $1.80 |
| Mervin Twillie | M | 4/23/70 | 1.70 | 3/19/71  10¢ | $1.80 |
| Cyril Ray | M | 9/ 1/70 | 1.60 | None | unemp. |
| Mark Sylvester | M | 7/14/70 | 1.60 | None | unemp. |
| L. Dozier | M | 10/27/70 | 1.60 | None | unemp. |
| Bobby Strickland | M | 1/22/70 | 1.60 | None | unemp. |
| Bob Greenwood | M | 1/27/71 | 1.80 | None | $1.80 |

\*\* These statistics were provided by defendant Greenbriar Nursing Home, Inc.