James D. HODGSON, Secretary of Labor,
United States Department of Labor,
Appellant,

v.

FAIRMONT SUPPLY COMPANY, a
corporation, Appellee.

No. 71–1430.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 4, 1971.

Decided Jan. 20, 1972.

Carin Ann Clauss, Atty., Dept. of Labor (Peter G. Nash, Sol. of Labor, and Richard F. Schubert, Sol. of Labor, Bessie Margolin, Associate Sol., Marvin M. Tincher, Regional Atty., and Mack A. Player, Atty., Dept. of Labor, on brief), for appellant.

Alfred J. Lemley, Fairmont, W. Va. (Russell L. Furbee, and Furbee, Amos, Webb & Critchfield, Fairmont, W. Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, BOREMAN, Senior Circuit Judge, and CRAVEN, Circuit Judge.

CRAVEN, Circuit Judge:

The Secretary of Labor brought suit in the United States District Court for the Northern District of West Virginia to enjoin Fairmont Supply Company from violating section 6(d) (1) of the Fair Labor Standards Act of 1938, as amended (29 U.S.C.A. § 201 et seq.), and to restrain Fairmont from withholding wages due under section 6(d) (3) of the Act to its employees Mabel Villers, JoAnne Fleming Chipps, and Lois Olson. The pertinent statutory sections are as follows:

(d) (1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of

the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

. . . . . .

(3) For purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this chapter.

Fairmont is engaged in wholesale sale and distribution of mining and industrial supplies. During the period under consideration,[1] Mrs. Villers and Mrs. Chipps were employed by Fairmont as stock desk clerks. Their work consisted of making additions and subtractions to inventory cards based on purchases and sales, indicating to purchasing agents how much inventory should be ordered to maintain the desired level, answering the telephone in the absence of inside salesmen, and taking orders by telephone for the absent salesmen. Each maintained the inventory cards for one-third of the stock desk. During this same period, Mr. Mason worked between Mrs. Villers and Mrs. Chipps at the center section of the stock desk and did the tasks just described. The salary histories for Mr. Mason, Mrs. Villers, and Mrs. Chipps for this period are as follows:

Mr. Mason
July 18, 1966 to Nov. 30, 1966
$425 per month
Dec. 1, 1966 to Nov. 30, 1968
$450 per month

Mrs. Villers
July 18, 1966 to May 30, 1967
$300 per month
June 1, 1967 to Nov. 30, 1968
$315 per month

Mrs. Chipps
July 18, 1966 to May 31, 1967
$280 per month
June 1, 1967 to Dec. 31, 1967
$295 per month
Jan. 1, 1968 to Nov. 30, 1968
$310 per month

Mrs. Chipps had worked at Fairmont since 1959 as a stock desk clerk. In addition to her stock desk duties, she did costing, matched warehouse orders, and maintained the inventory records for the plumbing department. Mrs. Villers had worked in Fairmont's purchasing department for ten years before transferring to the stock desk in July 1965. She also did costing on her inventory cards. Mr. Mason applied for *clerical work* with Fairmont and was hired on July 1, 1964. (App. 150). A memorandum of his hiring stated, "Mr. Mason has been hired as a sales trainee and will be put through our training program to learn all phases of sales processing." Before beginning work at the stock desk, he worked for three or four weeks in the warehouse learning about the activities there and for about six months in the general office learning to write credit and debit memorandums. On the stock desk he did not perform

1. Gilbert Mason, the male employee under consideration here, began working at the stock desk with Mrs. Villers and Mrs. Chipps about February 1965. The period under consideration, however, begins March 18, 1967, because the Secretary seeks back wages accruing only from that date. The Act's equal pay provisions became effective as to Fairmont on June 11, 1964, but back wages accruing prior to March 18, 1967, were barred by the applicable statute of limitations. Portal-to-Portal Act of 1947, 29 U.S.C.A. § 255. The period under consideration ends September 1968, when Mr. Mason left the stock desk.

the additional tasks performed by Mrs. Chipps and Mrs. Villers. In September 1968, after the installation on the stock desk of a system indicating the rate of turnover of inventory, Mr. Mason left the stock desk to become inventory control clerk. This job consists of doing the ordering work that was previously done by Mr. Mason, Mrs. Villers, and Mrs. Chipps together.

Lois Olson is the third female employee for whom back wages are sought. She replaced Mr. Mason on the stock desk and works as a stock desk clerk. Her starting salary in September 1968 was $165 per month less than Mr. Mason's.

The Secretary claimed that Mr. Mason was paid substantially more than Mrs. Villers, Mrs. Chipps, and Mrs. Olson for equal work on jobs performed under similar circumstances and requiring equal skill, effort, and responsibility. Fairmont denied that Mr. Mason and the female employees performed the same job, insisting that Mr. Mason did tasks not done by the women which required greater skill, effort, and responsibility. Fairmont also contended that Mr. Mason's sales trainee status was "a factor other than sex" justifying his higher salary under section 6(d) (1) (i) (iv) of the Act, set out above. The district court dismissed the Secretary's complaint. We reverse and remand for calculation of the wages due Mrs. Villers, Mrs. Chipps, and Mrs. Olson and for issuance of an injunction against further violation of the Act and withholding of wages due under the Act.

■ The Secretary carries the burden of proving equality of jobs.[2] Hodgson v. Brookhaven General Hospital, 436 F.2d 719, 722 (5th Cir. 1970). He need not show that what Mr. Mason and the three female employees did for the pay and during the period in question was identical; rather, he must show that what they did required equal skill, effort, and responsibility. "Equal" means *"substantially equal."* "Any other interpretation would destroy the remedial purposes of the Act." Shultz v. Wheaton Glass Co., 421 F.2d 259, 265 (3d Cir.), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). "As the doctrine is emerging, jobs do not entail equal effort [and skill and responsibility], even though they entail most of the same routine duties, if the more highly paid job involves additional tasks which (1) require extra effort [and skill and responsibility], (2) consume a significant amount of the time of all those whose pay differentials are to be justified in the terms of them, and (3) are of an economic value commensurate with the pay differential." Hodgson v. Brookhaven General Hospital, *supra*, 436 F.2d at 725. In evaluating the evidence presented by the Secretary in this case, we are mindful that under Federal Rules of Civil Procedure 52(a) we must accept the trial court's findings of fact unless they are clearly erroneous but that conclusions of law come to us clothed with a lighter presumption of validity. Shultz v. American Can Co.–Dixie Products, 424 F.2d 356, 360 n. 6 (8th Cir. 1970).

■ We think that the Secretary has sustained his burden of proving that the jobs performed by Mr. Mason and the three female employees for the pay and during the period in question required substantially equal skill, effort, and responsibility. The transcript shows that Mr. Mason worked at the stock desk with Mrs. Villers and Mrs. Chipps during the period in question and that his work at the center section was "[p]retty generally the same" (App. 107) as that at the two end sections maintained by the two women. The district court found as a fact that in addition to his stock desk

---

2. The statute speaks of "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, . . . ." There is no contention here that the women put forth less effort or time or that they worked under dissimilar conditions. Thus the only issue is whether or not Mr. Mason's job required greater skill, effort, and responsibility.

duties Mr. Mason performed 16 tasks not performed by Mrs. Villers and Mrs. Chipps,[3] and concluded that these additional tasks justified Mr. Mason's higher salary. We think that none of these tasks either alone or in combination with others justifies Mr. Mason's higher pay.[4]

For convenience of analysis these additional 16 tasks may be grouped as follows:[5]

### I

■ (1) "Working in the company warehouse for approximately one month learning the receiving functions, placing stock on the shelves, physical inventory, trucking procedures and all paper work in connection with the warehouse" and (2) "Was trained in and did pricing or billing of materials sold to customers." Mr. Mason's work in the warehouse and training in pricing occurred prior to the period he worked on the stock desk. (App. 165). These activities, therefore, cannot justify Mr. Mason's higher salary for the latter period. The finding that Mr. Mason did pricing is clearly erroneous. Mr. Mason and one company official testified that he did not actually do any pricing. (App. 107, 158). Apparently any billing Mr. Mason did consisted of correcting errors in connection with customer credits, discussed in section V below. (App. 121).

### II

■ (3) "Was required to and did attend meetings with manufacturers' representatives and internal sales meetings of the company to familiarize himself with the products sold by the particular suppliers of Fairmont Supply." Mr. Mason was paid for attending these meetings (App. 108), and there is no indication in the record that this pay was not commensurate with the skill, effort, and responsibility required. His higher salary, therefore, cannot be justified by this activity.

### III

■ (4) "Did and had the authority to order stock replacements, including the determination of the particular quantity and the particular supplier" and (5) "Took, filled and confirmed telephone orders from customers in the absence of regular inside salesmen." Mrs. Villers and Mrs. Chipps did exactly these same jobs. Mr. Mason and the two women indicated from the figures on their inventory cards to the purchasing department how much and from whom stock should be purchased, and the suggestions of all three were subject to being changed by the purchasing department. (App. 36–40, 60–62, 71, 156, 175–76, 182). One company official stated that Mr. Mason's orders were not reviewed by the purchasing department. (App. 101). Mr. Mason, himself, however, said that they were (App. 176–78), and we believe that Mr. Mason knew better what he did, especially in light of this official's vague knowledge about what exactly Mr. Mason did. (App. 103–07, 112, 114). This same official indicated, moreover, that Mr. Mason's orders were subject to his approval (App. 102), and this official worked as a purchasing agent during at least part of the period in question. (App. 95). Another company official stated that Mr. Mason placed orders with manufacturers. (App. 122). This assertion is questionable because neither Mr. Mason nor the other testifying official mentioned the

3. We assume that Mrs. Olson also did not perform any of the additional tasks performed by Mr. Mason since she described her job simply as "stock desk clerk." (App. 73).

4. Our conclusion does not depend upon the compensating factor that in addition to their stock desk duties Mrs. Villers and Mrs. Chipps performed tasks not performed by Mr. Mason. The record is in- adequate to evaluate the importance of the "additional" tasks performed by the women and not performed by Mr. Mason. In a close case a comparison of additional tasks performed by members of one sex and not by members of the other might be of controlling importance.

5. The quoted "tasks" are from the opinion of the district court.

task. Moreover, during the period in question, this official worked in outside sales, a department different than the stock desk, and, therefore, derived his limited (App. 138) knowledge about Mr. Mason's work on the stock desk "[o]nly from the general knowledge that I have of the operation." (App. 136).

Nothing in the transcript suggests that Mr. Mason "filled" telephone orders. One company official testified (App. 89) that Mr. Mason had the authority to "confirm" telephone orders. The testimony of the company officials and of Mr. Mason, however, does not indicate that Mr. Mason actually did confirm orders or that he was expected to do so. (*See* App. 88). In taking ordinary telephone orders, Mr. Mason and the two women did exactly the same thing. Compare Mrs. Chipps' account of how she performed this duty with Mr. Mason's account of what he did:

Mrs. Chipps

Q. "All right. What do you do when you answer the phone for the salemen?

A. I ask if I can take a message.

Q. Yes.

A. And have the salesman to return the call.

Q. Right.

A. If I could help them in any way.

Q. Do you ever take down any of the information?

A. Yes. I have written the information down. Yes.

Q. The information for an order?

A. I have. I have written up sales orders." (App. 45–46).

Mr. Mason

Q. "How did you do that? How did you take an order over the phone?

A. Well, why, the customer would call in and he would want to give an order, and starts telling you how much he wants and what he wants, the particular items, and

then you try to help in every way you can.

Q. What would you do after receiving that order over the phone?

A. You would write a sales order and pass it through for shipment." (App. 160).

Vague and conclusory assertions can not justify ignoring objective facts. On the record as a whole it is clear that these findings are not supported by substantial evidence. We are of the firm conviction that a mistake has been committed in concluding that Mr. Mason had greater responsibility than the women with respect to replacing stock and confirming telephone orders. W. Barron & A. Holtzoff, Federal Practice and Procedure § 1133 (C. Wright ed. 1961).

IV

█ (6) "Had and did exercise the authority to add new items of inventory" ("[W]e have repetitive items show up as being ordered by our customer, and in cases such as this Mr. Mason had the authority as directed by either the purchasing department or the manager to make up a stock addition slip and, of course, then this material would be added to our inventory." (App. 122)), (7) "Established a data-phone system with certain contract customers to speed up ordering of inventory requirements which were ascertained by visits to customer warehouses" ("He has traveled with our salesmen going into the customers' warehouses and made take-offs, calculated usage figures that would cause us to either increase our inventory or realign our inventory, I should say, based upon anticipated business . . . . [H]e has gone into their operations, has reviewed their inventory cards, would advise them that we stock this type items, and we could handle them for you, and again this is because of his knowledge of all the inventory-type items we carry." (App. 86–87)), (8) "Had the responsibility for advising the purchasing agent of inactive inventory items to be returned to the manu-

facturer" (App. 92–93, 128), (9) "Evaluated whether or not the company could retain items of inventory received over and above what was actually ordered, i. e. MRD Reports" (App. 94), (10) "Handled the purchase of non-stock items by evaluating weight, dollar volume and manufacturers' shipping requirements" ("Of course, the purchasing agent is responsible for the ultimate end result, however, and I was performing that duty at the time also. However, I depended on Mr. Mason to help me. He would take the non-stock items, he would determine if there was enough weight, if there was enough dollar volume, if the material could be bought by itself, if it would have to be grouped with stock items to have sufficient quantities for manufacturers' requirements, as far as minimum charges, and so forth." (App. 95)), and (11) "Was responsible for the transfer of inventory items between the company's other branches at Bluefield, West Virginia, and Washington, Pennsylvania." (App. 96, 129).

We think that these tasks required exactly the same skills and effort used in maintaining the inventory cards at the stock desk and in suggesting how much stock to order—adding, subtracting, calculating how much additional stock is needed to meet a desired level. Mr. Mason's decisions with respect to all of these jobs were subject to being changed by his superiors, and, therefore, required no more responsibility than his duties as stock desk clerk.

Two of these tasks require additional discussion. With respect to number seven, we think the record as a whole does not support the ultimate finding that Mr. Mason "established" the data-phone system; he merely calculated the amount of supplies needed by certain customers so that Fairmount could keep a sufficient stock of the items. There is no indication in the transcript that Mr. Mason's suggested orders for data-phone customers were not handled like other orders, i. e., that they were not subject to approval by a purchasing agent. Mr.

Mason did make a trip to a warehouse in Maryland and to a warehouse in West Virginia during the three-and-one-half-year period he worked at the stock desk. (App. 162). We think that the minimal amount of extra skill, effort, or responsibility required to make these trips from West Virginia and the minimal amount of time spent in this activity cannot justify the substantial pay differential. In connection with the data-phone system, Mr. Mason also telephoned customers to determine how much inventory should be maintained when an item suddenly began moving quickly. (App. 123, 161). But the determinations made before and after the telephone calls were exactly those made by the stock desk clerks in their routine ordering. The telephone calls themselves required no extra skill, effort, or responsibility; moreover, all the stock desk clerks occasionally used the telephone. In connection with the data-phone system, Mr. Mason also telephoned customers to determine when an order had to be filled that Fairmont could not fill immediately out of inventory. (App. 110–12, 161). Done pursuant to the direction of a company official, this task would seem to be little extra responsibility. If making a telephone call requires skill and effort, the record indicates that this task occupied only a small part of Mr. Mason's time. (App. 112). Mr. Mason and a company official testified that he had the "responsibility" for completing these orders. (App. 110, 161). The transcript is devoid of any description of how he did this, and it seems probable that his "responsibility" extended only to making the telephone calls and recording the manufacturers' needs. (*See* App. 111). With respect to number 11, the conclusory finding that Mr. Mason was "responsible" for the transfer of inventory items is contradicted by the fact that his decisions about whether the level of a particular item of stock was sufficient to allow transfer of some stock to other warehouses were subject to being changed by the purchasing agent. (App. 129).

V

(12) "Attended monthly meetings of the Mining Electrical Mechanical Maintenance Association as the representative of Fairmont Supply" (Mr. Mason was one of several representatives of the company. These meetings were stag dinners and the company paid for Mr. Mason's dinner. (App. 109, 157). "[T]he idea of attending was to learn—was to meet the customers that we have, learn their problems, and try to help them solve them" (App. 158)), (13) "Prepared customer credit adjustments for damaged or incorrect shipments" (This task was performed at the stock desk using forms used at the stock desk. The completed forms were passed along to the accounting department for final processing. (App. 113–14, 121, 140–41, 154–55)), (14) "Attended sales meetings with other salesmen held with manufacturers' representatives regarding changes in terms, pricing and new products" ("[H]e was invited to sit in on meetings with manufacturers who would come in to discuss maybe changes in terms, changes in discount structures, changes in products and things of this nature. He may have been asked then to go back and make a complete review of our inventory, decide at that point what we needed to order and an order would be placed then for it." (App. 122)), (15) "Expedited the delivery of orders by contacting by telephone the manufacturer of the products purchased by Fairmont Supply" (Working "under" a purchasing agent, Mr. Mason would telephone the manufacturer to request that a shipment be sent quickly. (App. 91, 127, 180)), and (16) "Was solely responsible for establishing an inventory system at the Fairmont branch that simplified the manner in which levels of inventory items were controlled" (This characterization of the evidence is misleading. Mr. Mason installed the system at Fairmont after seeing it in operation during a one-day visit to the Washington, Pennsylvania, plant. The system consisted of colored tabs attached to the inventory cards, the color indicating how fast a particular item moved. To install the system, Mr. Mason simply read the history of each item from its card and then attached the appropriate tab to the card. Reading information from the cards was routinely done by the stock desk clerks. Attaching the tabs is, therefore, the only additional task performed. (App. 69–71, 163–64)). If it be assumed that these tasks required different mental or physical processes than those performed by the women, it is clear, we think, that none required more effort, skill, or responsibility than the functions of the stock desk clerks. Moreover, except for the stag dinners, Mr. Mason and the company officials gave only the vaguest indication of how much time any of these tasks occupied (*see, e. g.,* App. 135–36) and did not suggest that any of these tasks were worth more to the company than the tasks performed by the stock desk clerks.

 Since the Secretary has sustained his burden of proving equality of jobs, Fairmont has the burden of proving that Mr. Mason's higher pay was justified by "a factor other than sex" within the meaning of section 6(d) (1) (i) (iv) of the Act. Hodgson v. Brookhaven General Hospital, *supra,* 436 F.2d at 722. The Secretary's Interpretative Bulletin, 29 C.F.R. § 800.148 (1971),[6] recognizes

6. § 800.148 Examples—training programs.
 Employees employed under a bona fide training program may, in the furtherance of their training, be assigned from time to time to various types of work in the establishment. At such times, the employee in training status may be performing equal work with nontrainees of the opposite sex whose wages or wage rates may be unequal to those of the trainee. Under these circumstancs, provided the rate paid to the employee in training status is paid, regardless of sex, under the training program, the differential can be shown to be attributable to a factor other than sex and no violation of the equal pay standard will result. Training programs which appear to be available only to employees of one sex will, however, be carefully examined to determine whether such programs are, in fact, bona fide. In an establishment where a differential is paid to employees of one sex because, traditionally, only they have been considered

that participation in a bona fide training program is a factor other than sex. Fairmont contends that Mr. Mason's participation in its training program for salesmen justified his higher salary during the period under consideration. We disagree. In the first place, we think that Fairmont had no training process structered enough to be called a "program." The "program" is described thus by the testimony:

Q. " . . . . What is your training program? . . . .

A. Well, each person will probably have a different training program depending upon what we expect to use them for. . . .

Q. And this consists largely of just working and learning the workings of your company, is that not true?

A. Right, yes, ma'am." (App. 98–99).

Q. " . . . . Well, is it a specifically-designed program with certain limits—certain periods?

A. We—again, when we hire somebody and specifically for a job like this, we start men in the same direction and then we hit a certain point where they begin to branch off where their particular qualifications lead them. So these programs that we have set up are such that again if we were hiring somebody for purchasing it would depend on—I mean for the purchasing job, it would depend again on what his background was, what his training had been prior, and so forth, as to what training we would give him." (App. 134).

Q. " . . . . Is it your [Mr. Mason's understanding you're still in the program?

A. Certainly. You're always in a training program as far as that goes." (App. 179–80).

We think that Fairmont's "program" is nothing more than the process by which one might work his way up in the company. "In this sense every job in every type of business would be training, and nothing would be left for the operation of the Interpretative Bulletin Training program. . . . [T]o sustain these so-called training programs as a justification for disparate pay would mean that 'the exception will swallow the rule.'" Shultz v. First Victoria National Bank, 420 F.2d 648, 656–657 (5th Cir. 1969). Our second reason for disagreement is that the sales training program was sex oriented and was not made available to women.

Q. "Have you ever had any women in a training program?

A. Yes. Only for the—for their phase of the business, yes.

Q. What is their phase of the business?

A. Well, it depends on what a secretary or whether a stock clerk or whether a stock clerk or filing clerk, or what we hire them for.

Q. Well, what do you hire women for?

A. The things I just mentioned.

Q. All right. Have you ever had a woman in a sales training program?

A. No, ma'am." (App. 133).

Q. "Did JoAnn Fleming Chipps, or Mabel Villers attend any of these meetings?

A. We do not include any of our female help because they are not really being oriented for sales work really. They're performing clerical duties and this is really a training program." (App. 81).

We cannot accept a training program co-terminous with a stereotyped province called "man's work" as a factor other than sex. Finally, we disagree because even if Fairmont does have a training

---

eligible for promotion to executive positions, such a practice, in the absence of a bona fide training program, would be a discrimination based on sex and result in a violation of the equal pay provisions, if the equal pay standard otherwise applies.

program for salesmen, we think that Mr. Mason was a stock desk clerk and not a sales trainee. Mr. Mason worked at the stock desk for three and one-half years. In this context it is absurd for the company to claim that Mr. Mason worked there only temporarily in order to become familiar with that part of the company's operations. (App. 103, 135). The longest anyone had ever been instructed about the work of the stock desk was about six weeks. (App. 63). Mr. Mason's new position also indicates that his work at the stock desk was permanent and not a temporary station along the road to being a salesman, because his new job consisted of essentially the same ordering work he did at the stock desk.

In summary, we think that Mr. Mason and the three female employees performed essentially the same job, and that Mr. Mason's higher salary was not justified by a factor other than sex. The judgment below, therefore, will be

Reversed and remanded.