John T. DUNLOP, Secretary of Labor
United States Department of Labor,
Plaintiff,

v.

GENERAL ELECTRIC COMPANY,
Defendant.

Civ. A. No. 73–C–156–R.

United States District Court,
W. D. Virginia,
Roanoke Division.

Sept. 16, 1975.

**1354**

Louis Weiner, U. S. Dept. of Labor, Philadelphia, Pa., for Dept. of Labor.

William B. Poff, Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., for General Electric.

## OPINION AND JUDGMENT

DALTON, District Judge.

In this case the Government contends that General Electric is violating the provisions of the Fair Labor Standards Act by paying men more than it pays women to perform essentially equal functions.[1] GE denies the charge and defends its pay scale on the grounds that the functions which the men perform require greater skill, effort and responsibility than those which the women perform. The parties have agreed that this court should decide the case on the basis of the depositions and briefs they have submitted to the court.

This case focuses on what is called the Price and Edit Unit at the defendant's Salem, Virginia, plant. The Price and Edit Unit receives and processes all the customer orders for the products of two of the departments of the Salem plant.[2] There are two basic methods of processing these orders: by computer or by hand. Those orders which identify the products requested by their proper, computer-legible numbers can be fed into the computer, which is referred to as the "remote inquiry program" or "RIP." The computer then prints out instructions for filling the order and the appropriate price. At this point the orders are sent elsewhere in the Salem plant, for the Price and Edit has completed its job. However, some orders which the Unit receives have an incorrect computer identification number, or lack the number entirely. These orders cannot be handled by the computer until the correct number is provided, so the computer operators turn them over to other

---

1. Jurisdiction is founded on section 17 of the Fair Labor Standards Act, 29 U.S.C. § 217: "The district courts . . . shall have jurisdiction, for cause shown, to restrain violations of section 215 of this title . . . ." Section 215 prohibits the violation of section 206, including the equal wage provision thereof, with which this case is involved.

2. "The overall mission of the price and edit group is to accept and expedite, as rapidly as possible, any and all customer orders arriving in Salem for either the drive system department or the industry control department." (Dep. Robinson at 264). The drive system department and the industry control department were not further identified or discussed in the transcripts or briefs.

employees who "manually edit" the orders by researching through catalogues, handbooks and even blueprints in order to identify the products which have been ordered and to give them the proper computer-identification number.[3] In general terms, the women handle the orders which the computer can read, and the men handle the orders which lack the computer identification number.[4]

The Government contends that the women's jobs are essentially equal to those of Mr. Andrews and Mr. Harris, who manually edit orders for what are called "renewal parts." (Hereafter, the term "the men" will refer only to Andrews and Harris.) If this is so, then GE is violating the Federal Fair Labor Standards Act because it is paying the men more than the women.[5] The pertinent provisions of that Act, 29 U.S.C. § 201 *et seq.*, require that an employer may not pay employees of one sex less than employees of the other sex for "equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions," unless the disparity in compensation can be justified on "a differential based on any . . . factor other than sex . . . ." 29 U.S.C. § 206(d)(1). The parties have not disputed that the workload of the women is equal to that of the men, or that their working conditions are similar, so the crucial question for this court is whether the jobs which the women perform require a skill, effort and responsibility equal to that required by the jobs of the men. The Government carries the burden of showing that those requirements are equal. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). The court is of the opinion that the Government has failed to meet that burden.

The Government emphasizes, and we agree, that the issue is not whether the jobs in question are identical, and, in fact, the jobs with which this case deals are clearly not identical. Instead, the issue is the jobs' "equality;" in the language of the Act, the issue is whether or not the jobs of the women require the same skill, take the same effort, and carry the same burden of responsibility as do the jobs of the men. We agree with the Secretary of

3. Sometimes the order will give a verbal or pictorial description of the product which the customer wants, without any identification number at all; sometimes the order contains an identification number which is incorrect. (Dep. Anderson at 300–02). In such cases it may take a considerable amount of research, through any number of different sources to be able to track down or isolate the product that will fit the customer's needs. The time which it takes to edit an order manually may range from "five seconds" to "five months." (Dep. Andrews at 205).

4. The women, Mrs. Horsley and Mrs. Robertson, normally receive all the incoming orders, enter those with good identification numbers on the computer, and route those with no numbers or incorrect numbers and those which the computer fails to process to the men. There are three kinds of orders which the Unit normally handles: renewal parts, components and accessories, and heavy equipment or panels. Mr. Andrews and Mr. Harris edit the orders for renewal parts, and it is their job which the govern-

ment claims is equal to that of the women; simple component and accessory orders are edited by the women (a fact which will be discussed below in the text) and the more complex component and accessory orders are edited by Mr. Hawley; the orders for panels or heavy equipment are edited by Mr. Hawley, with the exception of "electrical vehicle control panels," which are edited by the women (and which will also be further discussed). (See dep. Collins at 87; dep. Horsley at 119). Mr. Collins does all of the editing on the night shift (3–11 P.M.) which Andrews, Harris and Hawley have not finished during the day shift. Mrs. Robertson works with Collins on the late shift.

5. Mrs. Horsley and Mrs. Robertson are rated at "grade 8," and each receives a base salary of $174.76 per week (in addition to which Mrs. Robertson receives a 10% bonus for working the late shift, a differential which is not at issue in this case). Harris and Andrews are rated at "grade 12" and receive $239.59 per week. The lengths of all their shifts are identical.

Labor that the Act's criteria of skill, effort and responsibility are three separate tests, "each one of which must be met in order for the equal pay standards to apply." 29 C.F.R. § 800.122(a).[6] The Fourth Circuit has said that the requirements of skill, effort and responsibility for the women must be "substantially equal" to those requirements for the men in order for the government to prevail. *See Brennan v. Prince William Hospital Corp.,* 503 F.2d 282, 285 (4th Cir. 1974); *Hodgson v. Fairmont Supply Co.,* 454 F.2d 490, 493 (4th Cir. 1972). We do not believe that we have to worry about what "substantially equal" means; in this case we perceive a significant inequality in the skill, effort and responsibility required of the men and women of the Salem Price and Edit Unit.

██ An obvious place to start a comparison of the jobs of the men and of the women is with the employer's own official descriptions of the jobs in question here. While we realize that the ultimate test of equality must come from the work as it is actually performed *(Brennan v. Prince William Hospital Corp., supra,* 503 F.2d at 285), it appears from the depositions that GE's job descriptions accurately represent the *de facto* performance of the men and women in the Price and Edit Unit. The women are what are called "preliminary edit clerks" (grade 8), and according to their job descriptions, they

> Receive and review incoming orders, sort and enter routine information on punched tape. . . .
> Review the requisition and make inquiry to the computer system for available information concerning each part number on the requisition. If necessary information is available from provided reference sources the

information is attached or posted and the request is forwarded for distribution. If, after checking the system and provided reference sources, the necessary information is *not* available or is only partially available, the requisition is referred to the Requisition Edit operation [the men] for researching to obtain non system or non standard data.

(Dep. defendant's exhibit # 8, at 320).[7] The men are called Requisition Edit Clerks (grade 12), and according to their job description they

> Edit requisitions and customer orders that are not on the system or cannot be handled through the normal RIP [computer] procedure. Requires the use of prints, bulletins, old records, activity file, submitted drawings, etc. Many orders come in as descriptive (customer describes what is needed but gives no catalog #, etc.) and must be interpreted in order to identify, order and supply proper material.
> . . .
> Assist preliminary edit clerks as required.

(Dep. defendant's exhibit # 9, at 321). The testimony of the supervisor of the Price and Edit Unit, James D. Robinson, indicates that he believes that the job descriptions quoted above accurately represent what the preliminary edit clerks and the Requisition Edit Clerks actually do on the job. (Dep. Robinson at 295–6). The testimony of John C. Anderson, the former supervisor of the same Unit, corroborates Robinson's confidence in the *de facto* accuracy of the job descriptions. (Dep. Anderson at 307). The question, then, is whether the job of preliminary edit clerk requires a skill, effort and responsibility equal to the requirements of the men's jobs. We

---

6. We accord the Secretary's regulations the deference due them under *Griggs v. Duke Power Co.,* 401 U.S. 424, 434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1970).

7. Throughout this opinion, the court will refer to the exhibits of the parties and to the depositions of the witnesses by their exhibit numbers or names, and by the pages in the transcript where the exhibits or testimony are found.

will consider those criteria individually, and in that order.

■ An evaluation of the skill requirement, according to 29 C.F.R. § 800.125, ought to take into account factors like the experience, training, education and ability requirements of the jobs. Neither of the parties contends that the men's and women's jobs require any more or less education and ability of the employees. Instead, the disagreement focuses on the experience and training necessary to do the men's job, and on this issue the testimony seems to favor the defendant. Mr. Robinson, the current supervisor of the Unit, indicated that although it would be possible for the women to be trained to do the men's jobs, it would require an intensive effort:

A: . . . As I look at the operation performed by the RIP operators [the women], I see a mechanical type operation wherein practically all the information required comes from a stored source in our computer, any other small bits of information that they may need is immediately accessible to them right within reaching distance of their desks.

. . . . . .

Q: Do you think either of the RIP operators that you presently have in your unit could be trained to do the edit job [of the men]?

A: I will say that whether you are training the RIP operators to do the edit job or my job or anyone else's job, it can be done if you give them enough time and enough opportunity.

. . . . . .

Q: Do you have an estimate as to how long it would take one of your present RIP operators to train on the job before they could function as a remote edit clerk?

A: I would say this: if we took either of those girls and put them on that job, that they would require intensive training for six months and I would expect after a period of a year they would be reasonably capable of handling the job but again it would require intensive training for at least the first six months.

(Dep. Robinson at 277–9). Mr. Anderson, the former supervisor, agreed that the women would need extra training in order to do the men's job:

Q: Do you think either Mrs. Horsley or Mrs. Robertson could be trained to do Mr. Harris' or Mr. Andrews' job?

A: I feel sure they could be trained to do it, certainly.

Q: Do you have any idea or estimate of how long it might take?

A: Five years to gain the present status of let's say either one of the other fellows that you mentioned.

Q: Would it take that long for them to be able to function in the job?

A: No, I don't think it would take that long to function in the job. I think it would probably take certainly many months to function effectively and efficiently.

. . . . . .

Mr. Harris has been on the job now about nine years, roughly eight or nine years and he is beginning to approach the point where certainly now he is very competent in the job, but I think this comes about through just a lot of repeated exposure so to work into the job, yes, you could do it in a year or two, but to function efficiently and without a lot of lost time, it is going to take some time to do that.

(Dep. Anderson at 314–15). Mr. Anderson also explained why the requirements for experience between the jobs were different:

A: Well, the job that is performed by [the women] is pretty

**1358**

straightforward. The answers are either from the RIP system, what they receive back on the teletype from the system, or what they have in their files that are already there, the print-out files, they use this data to do what we call the preliminary edit.

Their data is pretty well a pre-catalogued type of information, it is pretty well defined by catalog numbers, it is a matter of looking up some type of documented information as contrasted to Harris and Andrews who have to do the balance of any edit work that has to be done regardless of where they get the information from, it involves a certain degree of background knowledge, of knowing where to look for this information because most of this type of thing they get involved in is strictly a verbal description of what the customer needs.

.    .    .    .    .    .

.    .    .    [T]he work that [the men] do is certainly more involved because there is nothing basically to start with except a description or a bad catalog number, things like that that Margaret and Delores can't get out of the RIP system.

(Dep. Anderson at 300–01, 02). The testimony of Mr. Harris, one of the men whose job is allegedly equal to that of the women, seems to support his supervisor's view:

Q:  As I understand it, the information that Mrs. Horsley would be obtaining would be system, RIP information?

A:  Yes.

Q:  Information you would provide would be what we might call non-system information?

A:  Right, research or something else.

Q:  That would come from something you would know from your experience?

A:  It could be.

Q:  And it might be something you could look up from a reference source?

A:  Yes.

Q:  Or it may be that you would need to know where to call within the company to get the information?

A:  Yes.

Q:  Or you may have to research it through blueprints or any other company material that might be available.

A:  Right.

Q:  Is this the kind of knowledge that is possessed by Mrs. Horsley or Mrs. Robertson?

A:  Not basically regarding renewal parts, no, sir.

(Dep. Harris at 48–9). Mr. Andrews, a member of the Price and Edit Unit whose job is not at issue in this case, seems to echo Mr. Harris' view:

Q:  .    .    .    What is involved in getting a catalog number?

A:  Well, this is, you can't oversimplify it, in some cases it is really complicated to get a catalog number.

Q:  It can be anything from very simple to very complex, that is your whole job?

A:  Right.

Q:  Sometimes you have to go to blueprints to get it?

A:  Right.

Q:  And sometimes you know it from experience in what you have picked up on the job?

A:  Right.

Q:  And sometimes you get it from reference sources?

A:  Right.

.    .    .    .    .    .

Q:  Is experience on the job a factor in learning to become familiar with the products and the customers?

A: I would say that without experience, you are really going to be at a loss. . . .

(Dep. Andrews at 230-1, 223). The point seems to be that the men's job requires not merely a different kind of experience, but quantitatively more experience than the women's job requires. This is the point that Mr. Anderson emphasized:

Q: What, in your opinion, justified the difference in grades [between the men and the women]?

A: I would just say that the knowledge that has to be acquired over a long number of years to build up to this point to do this kind of edit, regardless of what kind of word the customer sends in on his order, I would say the skill and the knowledge, primarily.

I think you get this knowledge by just repeated exposure to these kinds of orders.

I would say certainly the degree of knowledge that you have got to have, just a higher level of knowledge, overall knowledge of all of the products of the entire department.

Q: And is it true that the knowledge is gained through experience with the company?

A: Very definitely.

Q: Do you think either Mrs. Horsley or Mrs. Robertson could be trained to do Mr. Harris' or Mr. Andrews' job?

A: I feel sure they could be trained to do it, certainly.

(Dep. Anderson at 313-14). The requirement of experience was strongly emphasized by Mr. Collins, who edits on the late shift with Mrs. Robertson and whose job is not at issue here:

Q: Now, I understand that you work all in one department and that there is some overlap here and there in what you do, but is it fair to say that basically Mrs.

Horsley and Mrs. Robertson do the editing work that they can do with the RIP computer system?

A: That is basically what they do.

Q: They also can refer to some, what has been referred to by other witnesses as a standard reference?

A: Yes, sir.

Q: If it gets beyond the RIP system and the standard reference sources, do they, as a normal matter, do any editing beyond that?

A: No.

Q: That would be something that would be within the expertise of you or Mr. Andrews or Mr. Harris or Mr. Hawley?

A: That is correct.

Q: Does the edit work that you do and that Mr. Hawley and Mr. Andrews and Mr. Harris do require knowledge and experience beyond that which Mrs. Horsley and Mrs. Robertson have?

A: It definitely does.

(Dep. Collins at 88-9). Finally, one of the women, Mrs. Horsley, appears to have agreed substantially with the opinions quoted above on the different requirements of the men's and women's jobs:

A: . . . Mr. Harris and Mr. Andrews do the type of, if there is any lookup, if they have to go back to blueprints or go back to our data books and so on to get information if we have something that we don't have a good number on it.

Q: Where are these books kept that they refer to?

A: They are kept in the office.

Q: Do you ever have any occasion to use any of these reference sources?

A: Very rarely, sometimes I do, but not very often. Most of the time if I have to, I will go to them and they will do the lookup for me.

Q: Are you familiar with what is in these reference sources?

A: If I had to find something, I think I would be able to find it, but I am not familiar with it, really. This is the type of thing that we leave to them. . . .

(Dep. Horsley at 102–3).

■ The conclusion that seems to emerge from this and the rest of the testimony is that the men's job requires a background of knowledge and experience which the women do not possess and which their job does not require. It is not a question of ability, for both supervisors agreed that the women could learn the men's job thoroughly; rather, it is a question of experience, which the overwhelming weight of the evidence indicates that women's job does not demand.[8] Of course, the efficient operation of the Unit depends upon all of its employees, but in the performance of their jobs the men appear to need a length and breadth of experience not required of the women. In demanding more experience, the men's job demands more "skill," as that word is used in the Act and is defined in the regulations.

The court believes that the skill requirements of the two jobs in question are different despite the fact that there is some undoubted overlap in the jobs of the men and of the women. It was estimated that the men perform manual editing duties only about fifty percent of the time, and that the rest of the time they answer the phone, handle correspondence and share other secretarial duties with the women. (Dep. Robinson at 273, 283; dep. Harris at 24, 36). In addition, the women do some of the manual editing for certain kinds of orders, and share the duty of pricing orders with the men.[9] (Dep. Horsley at 119, 121; dep. Robertson at 190, 163; dep. Andrews at 209; dep. Robinson at 276). However, the record is clear that the primary responsibility of the men is their manual editing, and the primary responsibility of the women is the computer system. (Dep. Robinson at 282; dep. Anderson at 300.) The manual editing which the women do takes only about twenty-five percent of their time (dep. Robertson at 165) and is limited to the most simple kinds of orders: ". . . they more or less are confined to that information which comes out of the system of the computer or that is easily accessible, a look-up type of thing in that all we are trying to do, all they are trying to do is verify, 'Is this a good number or a bad number?' . . . And they reach a point where they can't determine that and they give it over to me." (Dep. Hawley at 240. See also dep. Robinson at 272: "Apart from the RIP, . . . they do what I classify as simple component editing and on those type jobs, all of the necessary information that is required to edit is immediately available in our hand book."

8. The government places emphasis in its brief on Mrs. Robertson's belief that there was nothing in the men's job that would be hard for her to do if she "had the time." (Brief for plaintiff at 15; dep. Robertson at 161.) While all of the witnesses agreed with her on this point, her statement cannot be taken as evidence that the men's job requires a level of skill equal to that of her current job. In the first place, her statement implies that the experience she has gained in her current position would not enable her to perform the men's job efficiently—i. e., that the men's job requires more experience. Furthermore, the fact that she could learn the men's job, or that she might be able to do it now, does not mean that her current job is "equal" to the men's, because it does not mean that her current job requires the skill of the men's job. In fact, almost all of the evidence indicates that her current job does not require an equal level of skill. If Mrs. Robertson's skill were equal to that of the men, but not required by her job, the appropriate action—if any—would be a charge of discrimination in hiring or placement and not discrimination in wages.

9. This litigation appears to have grown out of a reorganization of the Price and Edit Unit in 1971, when the women were given the additional duty of manually editing the components orders, and were raised from a grade 6 to grade 8 on the pay scale. (Dep. Robertson at 152).

See also dep. Horsley at 123; dep. Collins at 88; dep. Anderson at 303).[10] Taking into consideration all of the overlap which exists between the jobs of the men and of the women, it still appears that the men perform a function which is primarily dependent upon their experience, and that the women's job does not require any such breadth of experience.[11] The weight of the evidence indicates that the skill—that is, the experience—which the men's job requires is greater than that required for the performance of the women's job. In that respect, the jobs are not equal.

Whether or not the effort required of the men's and women's jobs is equal is a much more elusive question, partly because none of the witnesses spoke specifically to this issue and partly because the comparison of "efforts" tends to be a baffling proposition. The government contends that the men, who research for catalogue numbers, exert a "different type of mental effort" than the women,[12] but that this is counterbalanced by the effort exerted by the women in handling the bulk of the department's orders, handling the RIP system, manually editing some of the orders, and doing their other duties. (Brief for plaintiff at 14). We agree that the women handle a larger number of orders and may have a larger absolute number of duties than the men. On the other hand, the men's primary job of manual editing was described as considerably more complex that any of the du-

ties of the women. (Dep. Robertson at 187–9; dep. Horsley at 133; dep. Anderson at 301). The court believes that, almost as a matter of definition, a job which is more complex than another involves, for the average person, more mental effort to accomplish. *See, e. g. Brennan v. The Cain-Sloan Co.*, 75 Lab. Cas. ¶ 33,172 at 46,776 (M.D.Tenn. 1974). In addition, Mrs. Robertson conceded that she found the men's job "hard to do" (dep. Robertson at 161), which the court interprets as implying that she would have to exert more effort were she, at her current level of training and experience, given the job of the men. There is no testimony indicating whether the men would find the women's job hard to do, but the men certainly can recognize good, bad, or non-existent identification numbers, and probably already are familiar enough with the operation of the computer to be able to substitute for the women with little difficulty. In a straightforward comparison of the relative difficulties of the jobs, Mr. Anderson indicated that he thought that the manual editing which the men do is "more difficult" to do than what is required of the women. (Dep. Anderson at 302.) That in itself would suggest that the men's job requires more effort than the women's job. The government's allegation, that the "different" efforts required of the men and the women are nevertheless equal, begs the question; the government has failed to explain *why* they are

10. Neither of the women assumes the manual editing and research duties of the men when the men are absent from work, except in the case of an emergency order. (Dep. Horsley at 129; dep. Collins at 80–81; dep. Robertson at 159–61). It was in the context of emergency orders that Mrs. Robertson said that she had performed the men's job and had found it hard to do.

11. The women are required to have a certain familiarity with renewal parts—the orders for which Andrews and Harris do the manual editing—because it is they who first receive all the orders and it is they who determine which are for renewal parts and must go to Andrews and Harris. (Dep. Horsley

at 96). The court does not believe that the ability to distinguish renewal parts orders from other kinds of orders requires the same experience as that required to determine *which* renewal part the customer wants. In its brief the government did not mention this specific duty as evidence of the equality of the jobs, and did concede that the men have "some greater familiarity with renewal parts" than the women. (Brief for plaintiff at 15). It seems to the court that that "greater familiarity" is the crux of this case.

12. The jobs at issue in this case are desk jobs, so the case involves no question of physical efforts.

equal, or how it arrived at that conclusion.[13] We do not believe that the government has met its burden of proof regarding the equality of effort, since there is nothing in the record to support its assertion that an apparently more complex and more difficult job requires an effort equal to that required by a simpler job. We hold that the women's job has not been shown to require an effort equal to that required by the men's job.

Finally, we hold that the men's job is a more responsible position than that of the women, because the men are more accountable for the performance of the mission of the Price and Edit Unit. 29 C.F.R. § 800.129. We agree with the government that the men are not supervisors of the women and that for the most part the men do not advise or guide the women. (Brief for plaintiff at 12). However, we believe that there is another respect in which the men are more accountable than the women for the accomplishment of the Unit's purpose. The overall "mission" of the Unit is to find out what the customer wants and to fill his order. (Dep. Anderson at 302). In the pursuit of this goal, the women generally handle the orders with the correct identification numbers, and turn over to the men those orders without correct identification. After the men identify an order and find its correct number, they return the order to the women, who finish processing it through the computer. Mr. Robinson, the Unit's supervisor, spoke of this operation:

. . . [J]ust the moment [the women] look at an order that they are doubtful about that they do not understand or that they can't complete, they have a spot for it to be dropped into someone's basket and I am referring specifically to . . . the edit clerks and at that point they are through with the job.

Now moving over into the operation performed by Andrews and Harris, they do not have this prerogative of finding another spot to drop this job if they can't complete it.

13. The government's contention that "different efforts" may be "equal" is based on 29 CFR § 800.127–8, which says that two jobs "may require equal effort in their performance even though the effort may be exerted in different ways on the two jobs." Yet the regulation does not say how these different efforts are to be measured. The regulation cites an example of a male and female checker in a supermarket; the male generally lifts heavy packages, the female does other work, like arranging displays of small items. These "efforts" are equal, says the regulation, because the dexterity required of the female is commensurate with the heavier labor required by the male.

The court believes that this is a doubtful proposition at best since, as a matter of common sense, the movement of heavy weights must require more "effort" than the movement of light weights. The requirement of "dexterity" on the part of the female appears to be a function of skill, rather than of effort, and the example properly should stand for the proposition that if one job requires more effort than another, but the second requires more skill, they still may be "equal" under the Act. Whether or not this is a correct interpretation of the Act is a question that will have to await a later determination, and is no part of the decision in this case.

Abandoning the example in the regulation, we are left with instructions that we must determine whether different efforts are equal, but without directions about how to measure that equality. Our first reaction is that jobs which require different efforts may merely be different jobs and cannot be called "equal" under the Act. 29 C.F.R. § 800.120. If this is too narrow a view of the Act, we are still left with a measuring job for which we are provided no standards. How can we rationally and responsibly determine whether this effort, though different, is "equal" to that one? It is a task which begs for arbitrary resolution. We believe that the substitution test that we have used in the text —suggested to us by the Fourth Circuit in *Brennan v. Prince William Hospital Corp.,* *supra,* 503 F.2d at 287—provides some standard with which to measure different but equal effort. Such measurement is not an exact science, but that standard may steer us away from the completely arbitrary decision process which the government's bald "different but equal" statement exemplifies.

We mentioned awhile ago that when they have exhausted all of their resources to identify an item, we said that they now go back to the customer for reidentification and they continue to do this unless the customer says "All right, forget it, I will send through a cancellation on the order."

This is the only thing that relieves them of that job, but again back to our Grade Eight RIP Operators, the minute they hit a problem, they have a spot for it to be dropped.

(Dep. Robinson at 278). The men have the responsibility of taking over where the women's expertise falters, while the women have no comparable responsibility. In other words, the women can pass the buck, while the men cannot. The ultimate responsibility for the satisfaction of the customer lies with the men; while all of the members of the unit share the same responsibility for ensuring the satisfaction of customers whose orders can be filled, only the men have the responsibility of deciding which orders cannot be filled, and which customers must therefore go unsatisfied.[14] In a competitive business, this seems like an important responsibility. Thus the men appear to have a responsibility which exceeds that of the women, and we cannot say that the men and women have equal responsibilities.

■ Our holding, then, is clear. We have found that the jobs of the men require more skill and involve more responsibility than those of the women, and we have found that the government has failed to show that the effort required by the women's jobs is equal to that required of the men. We therefore hold that the jobs have not been shown to involve equal skill, effort and responsibility, that they are not equal under the terms of the Fair Labor Standards Act, and that the disparate wages paid to the men and women of the Price and

Edit Unit are therefore not in violation of that Act. Judgment is ordered for the defendant, and the case is ordered stricken from the docket. Each party shall bear their own costs.

---

14. The women also screen and reject those orders which come from customers who are not franchised to order renewal parts from the Salem plant. This they do by comparing the name of the customer on the order with a master list of franchised customers. They also reject all orders which lack the name of the customer. (Dep. Robertson at 144).