Peter J. BRENNAN, Secretary of Labor, United States Dept. of Labor, Plaintiff-Appellant,

v.

OWENSBORO–DAVIESS COUNTY HOSPITAL, CITY OF OWENSBORO, KENTUCKY, and Daviess County, Kentucky, Defendants-Appellees.

No. 73–1261.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 5, 1973.

Decided Sept. 30, 1975.

Alfred G. Albert, Acting Sol. of Labor, Marvin Tincher, Regional Atty., Frank Steiner, Atty. U. S. Dept. of Labor, Nashville, Tenn., Donald S. Shire, Deputy Associate Sol., Carin Ann Clauss, Associate Sol., U. S. Dept. Labor, Washington, D. C., for plaintiff-appellant.

Philip B. Hayden, Ronald M. Sullivan, Sandidge, Holbrook, Craig & Hager, Owensboro, Ky., for defendants-appellees.

Before WEICK, McCREE and LIVELY, Circuit Judges.

McCREE, Circuit Judge.

This is an appeal from a judgment determining that appellees' practice of paying higher wages to "male nursing assistants"[1] than those paid to "nurse assistants" who are female does not violate the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1), (3)[2] because the wage differential was justified by differences in skill, effort, and responsibility and by dissimilarities in working conditions.[3] This appeal requires us to examine the district court's findings of fact to determine whether they are supported by the evidence, and whether they permit, as a matter of law, its conclusion that male nursing assistants are required to exert substantially greater effort, to employ substantially greater skills, and to assume substantially greater responsibility than nurse assistants.

The action was brought by the Secretary of Labor in the fall of 1971 against the Owensboro-Daviess County Hospital (the hospital), the City of Owensboro, and the County of Daviess to enjoin them from violating the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1), (3) by paying higher wages to "male nursing assistants" (orderlies) than are paid to female "nursing assistants" (aides), and to restrain them from withholding payment of past wages due under the Act.

The hospital is a not-for-profit Kentucky corporation located in Owensboro, Daviess County, Kentucky, and is operated by the City of Owensboro and the County of Daviess through an appointed Board of Management. The parties have stipulated that appellees constitute an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the Act, and that consequently the employees of the hospital are entitled to whatever protection and benefits the Equal Pay Act affords. The period covered by this action, based upon the complaint and by agreement of the parties, is from April 5, 1968, to the date of the commencement of trial, October 31, 1972. The discrimination charged is not limited to any department of the hospital.

During the period covered by this action, the hospital regularly employed approximately 30 to 40 orderlies and ap-

---

1. The titles of "male nursing assistant" and "nurse assistant" are the official designations for hospital personnel commonly known as orderlies and aides respectively.

2. Section 206(d) of Title 29 provides in relevant part:

 (d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differ-

ential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee. . . .

 (3) For purposes of administration and enforcement, any amounts owing to any employee which have been witheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this chapter.

3. In *Corning Glass Works v. Brennan,* 417 U.S. 188, 202, 94 S.Ct. 2223, 2232, 41 L.Ed.2d 1 (1974), the Supreme Court, in defining the term "working conditions," held:

 . . . the element of working conditions encompasses two subfactors: "surroundings" and "hazards." "Surroundings" measures the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity, and their frequency. "Hazards" takes into account the physical hazards regularly encountered, their frequency, and the severity of injury they can cause. [Footnotes omitted.]

proximately 160 to 180 aides. As a general rule, each of the four floors of the 462 bed hospital was divided into four nursing stations and, depending on the shift, two or three "nurse assistants" were assigned to each station and one or two "male nursing assistants" were assigned to each floor.

After the presentation of the Secretary's evidence, the district court, *sua sponte*,[4] directed a verdict for appellees and thereafter made the following findings of fact: (1) that the job descriptions for aides and orderlies revealed substantial differences in duties and that these descrptions accurately portrayed differences in the actual duties performed; (2) that a typical aide, unlike a typical orderly, spent substantially all her time at the hospital in rountine patient care; (3) that orderlies, unlike aides, received special training in sterile procedures and techniques, in removing casts, and in setting up traction; (4) that aides were closely supervised, while orderlies exercised discretion in performing their duties, particularly in responding to "stat" or emergency calls; (5) that orderlies, unlike aides, were responsible for the care of violent or potentially violent patients; (6) that orderlies, because of their fewer numbers, were required to do post-mortem work more often than the aides; (7) that the orderlies' work was continuous, demanding and tiring, and that the frequent emergency calls caused tension and strain while aides' duties involved much less tension and strain; (8) that orderlies had less time for relaxation during working hours than aides did; and (9) that the orderlies' work was more arduous than that of aides and required more physical effort and strength.

On the basis of these findings, the district court concluded not only that the Secretary had failed to establish that the tasks performed by aides and orderlies were substantially equal, but also that aides and orderlies performed substantially different jobs under substantially different working conditions, and that the duties of a typical orderly required greater skill, effort and responsibility than did the duties of a typical aide. Accordingly, the district court concluded that the higher wages paid to orderlies were justified, and that appellees had not, therefore, violated the Equal Pay Act.

A careful examination of the record convinces us, however, that the critical findings of fact upon which the district court based its conclusions are clearly erroneous. The job descriptions for aides and orderlies did not differ significantly for most of the period covered by this action. Moreover, the record shows, contrary to the findings made by the district court, that some aides, as well as orderlies, were trained to do sterile procedures and did them on a regular basis; that aides as well as orderlies lifted heavy patients, restrained unruly ones, and responded to emergency calls; and that aides had less free time than orderlies did. In addition, although the record discloses that as a general rule orderlies and not aides set up traction and assisted in removing casts, these duties were performed so infrequently that they did not render the jobs of aides and orderlies substantially different. Finally, although orderlies may have, on the average, done more post-mortem work than aides did, this modest difference does not justify the higher wages paid to orderlies.

4. The transcript of the trial discloses the following conversation among the court and counsel:

> MR. STEINER: Uh, the Plaintiff closes, Your Honor.
> BY THE COURT: Plaintiff closes?
> MR. STEINER: Yes, Your Honor.

> BY THE COURT: I'll sustain a motion for a directed verdict without argument, and you will redraw your findings—proposed findings and conclusions.
> MR. LOVETT [FOR THE DEFENDANTS]: Yes, Your Honor.
> BY THE COURT: . . . All right, Mr. Marshall; we stand in recess.

## JOB PREREQUISITES, TITLE, AND TRAINING

The employment prerequisites for the jobs of aides and orderlies were precisely the same during the period in question: (1) a diploma from an accredited high school; (2) good moral behavior; (3) good health; and (4) a recommendation of character. In addition, as we have already observed, in the job description bulletins issued by appellees, the formal titles, "nurse assistants" and "male nursing assistants," are virtually identical except for the designation "male" in the latter. Moreover, aides and orderlies attended the same introductory four week training course and, with one exception,[5] received identical instruction.

At the same time, however, appellees maintained one wage scale for male nursing assistants and another lower scale for nurse assistants. Although both scales provided for higher wages based upon experience, a male nursing assistant begins working and continues to work at a wage higher than that paid to a nurse assistant with comparable experience.[6]

5. Aides hired after October, 1968, received no training in catheterization procedures.

6. The wages received by aides and orderlies during the period of time at issue were as follows:

### ORDERLIES

| | Min. | 3 Mos. | 6 Mos. | 1 Yr. | 1½ Yrs. |
|---|---|---|---|---|---|
| 11-13-66 | $1.30 | $1.45 | $1.55 | $1.60 | $1.75 |
| 9-14-67 | 1.40 | 1.55 | 1.65 | 1.70 | 1.85 |
| 9-15-68 | 1.50 | 1.65 | 1.75 | 1.80 | 1.95 |
| 9-15-69 | 1.65 | 1.80 | 1.90 | 1.95 | 2.10 |

| | Min. | 3 Mos. | 9 Mos. |
|---|---|---|---|
| 9-27-70 | 1.85 | 2.10 | 2.30 |
| 12-19-71 | 2.00 | 2.25 | 2.45 |

### NURSE ASSISTANTS

| | Min. | 3 Mos. | 6 Mos. | 1 Yr. | 1½ Yrs. | Special | 2 Yrs. | Special |
|---|---|---|---|---|---|---|---|---|
| 11-13-66 | $1.20 | $1.25 | $1.30 | $1.35 | $1.40 | $1.48 | | |
| 9-14-67 | 1.30 | 1.35 | 1.40 | 1.45 | 1.50 | 1.58 | | |
| 9-15-68 | 1.40 | 1.45 | 1.50 | 1.55 | 1.60 | | 1.65 | 1.70 |
| 9-15-69 | 1.55 | 1.60 | 1.65 | 1.70 | 1.75 | | 1.80 | 1.85 |

| | Min. | 3 Mos. | 9 Mos. | Special |
|---|---|---|---|---|
| 9-27-70 | 1.70 | 1.85 | 2.05 | 2.10 |
| 12-19-71 | 1.85 | 2.00 | 2.20 | 2.25 |

| | NUMBER OF ORDERLIES | NUMBER OF NURSE ASSISTANTS |
|---|---|---|
| 9- 2-67 | 25 including 1 part-time | 162 |
| 3-31-68 | 29 including 2 part-time | 163 |
| 10-12-68 | 31 including 4 part-time | 160 |
| 4-12-69 | 31 including 4 part-time | 160 |
| 2-14-70 | 31 including 3 part-time | 179 |
| 4-11-70 | 29 including 4 part-time | 180 |
| 10- 1-71 | 32 including 4 part-time | 180 |
| 9-28-72 | 38 including 8 part-time | 180 full-time 10 part-time |

One aide who worked in the obstetrics ward of the hospital testified that she received the special pay indicated in the chart. The record does not contain an explanation for her special pay. However, even aides who received special pay were paid wages lower than those paid to orderlies with the same length of employment.

## JOB DESCRIPTIONS

■ Although job descriptions should not be accorded as much weight as that given to the duties actually performed by employees in determining whether two jobs are substantially equal, nevertheless, we believe that they may be helpful, particularly where the descriptions of the jobs to be compared are similar and were written by the very employer who claims that wage differentials are not based on an impermissible criterion.[7] Cf. *Corning Glass Works v. Brennan*, 417 U.S. 188, 203, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

In this case, we observe that in both the January, 1969, and the January, 1972, job description bulletins issued by appellees, the primary duty of a nurse assistant appears virtually identical to that of a male nursing assistant: a nurse assistant "[a]ssists the Professional Nursing Staff by performing duties in caring for patients," while male nursing assistants "[a]ssist the Nursing Staff in performing duties in caring for patients." These bulletins also state that both aides and orderlies are responsible to the professional nursing staff, the former to the unit supervisor of nursing service, and the latter to the charge nurse.

### THE 1969 BULLETIN

The detailed job descriptions of aides and orderlies found in the 1969 bulletins are virtually identical, and the differences disclosed are insignificant for the purposes of the Equal Pay Act. According to these bulletins, both aides and orderlies take and record temperature, pulse and respiration; both take blood pressure; both give cleansing and therapeutic baths, and orderlies finish all the baths on male patients; both give enemas; both do sterile procedures including catheterizations, catheter irrigations, bladder installations and irrigations;[8] aides apply hot and cold compresses under supervision, clean and apply colostomy dressings on permanent cases under supervision, and give back care to all patients who are bedridden, while orderlies apply dressings, compresses, or medication to the penis and scrotum, and change colostomies on permanent cases; aides apply hot water bottles and ice bags, while orderlies fill and apply hot water bottles and ice bags; both have post-mortem duties; both discontinue subcutaneous injections and I.V.'s under supervision; both issue and empty bedpans, and collect urine and fecal specimens; both keep records of a patient's intake and output; both assist in preparing patients for surgery; both report observations and complaints of patients to the nurse in charge; aides are required to insure that all patients are clean and dry before leaving their units, while orderlies are required to make sure that all male patients on the floor to which they are assigned are dry before going off duty; and aides weigh ambulatory patients and assist in weighing bedridden patients, while orderlies weigh bedridden patients.

According to the 1969 bulletins the following differences exist in the jobs of aides and orderlies: aides give perineal care while orderlies do all treatments of the penis and scrotum; aides assist male and female patients with urinals and bedpans while orderlies check for "due-to-voids"; aides assist patients in and out of bed and turn patients who are unable to turn themselves, while orderlies help patients get out of bed, walk

---

7. We agree with the Secretary of Labor that "[a]pplication of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance." 29 C.F.R. § 800.121 (1974). Therefore, if there were a conflict between job description bulletins and actual duties performed, the latter would be deterministive of the existence *vel non* of a violation of the Equal Pay Act.

8. It is interesting to note that even though aides hired after October, 1968, received no training in catheterization procedures, the job description bulletin for aides revised in June, 1969, still listed catheterizations as a duty performed by aides. Some time later, this duty was deleted.

them and help to turn them; aides assist in admitting patients to the hospital, transferring them within the hospital, and discharging them from the hospital, while orderlies help to admit male patients and to transfer and discharge patients; aides are required to answer signal lights promptly, while orderlies are required to answer signal lights immediately and to respond to page calls; aides help to start and to discontinue oxygen therapy, while orderlies set up and put oxygen in use when necessary; aides are required to insure that patients have fresh water at all times and to change thermometers for patients staying longer than a week, while orderlies must keep ice carts filled; aides clean the dressing cart and medicine room under supervision, and clean the utility room, treatment room and kitchen, while orderlies help keep the linen room neat and the utility room clean by cleansing enema and catheter trays; aides report any out-of-order or broken equipment to the nurse in charge, while orderlies are required to keep the emergency oxygen equipment in working order and to take care of their own equipment. In addition, aides make beds, serve meal trays, feed patients if necessary, remove water pitchers from the rooms of N.P.O. patients after midnight, and make sure that patients who are scheduled for diabetes or blood sugar tests have water only. Orderlies must, in addition to the duties already described, check and obtain linen for their shifts, including the packs to make up beds when patients are discharged.

## THE 1972 BULLETIN

In January, 1972, shortly after this suit was filed, these job descriptions were amended to include for both aides and orderlies the duties of making beds, serving food trays, performing clini-tests and acetests, and applying binders. The new job description added for aides the duty of measuring, describing, and emptying the contents of Gomco suction and urine drainage bags. For orderlies, the new job description added the duties of assisting in restraining patients, pursuing runaway patients, bringing oxygen tanks from the basement, cleaning up minor spills, assisting in applying, cutting, and removing casts, inserting rectal suppositories, and assisting with cardiac massage.

It is apparent that at least through January, 1972, most of the time period covered by this lawsuit, the job descriptions for aides and orderlies were virtually identical. From January, 1972, until the date of trial, the job description for orderlies added duties apparently not performed by aides that required effort (restraining unruly patients, pursuing eloping patients, and bringing oxygen tanks from the basement of the hospital), skill and responsibility (cast work and assisting with cardiac massages) greater than or, at least, different from the skill, effort and responsibility required of aides. These additional tasks, according to the hospital administrator, were not new but traditionally have been performed by orderlies. In addition, the 1972 bulletin describing the tasks assigned to aides no longer listed various sterile procedures.

## ACTUAL DUTIES PERFORMED

The district court, in addition to making more particularized findings of fact about duties actually performed, also made what might be called a general finding of fact as follows:

> The typical aide spends substantially all of her time at the hospital in routine patient care, requiring nominal skills, such as giving baths to patients, making beds, serving and picking up food trays, feeding patients, making errands to perform small services and answering requests for small personal needs.

> The typical orderly spends a very small part of his working time in . . . routine patient care . . . but spends substantially all of his working time in performing Sterile Techniques, including catheterizations, lifting heavy patients, changing TUR dressing[s], setting up Tractions, han-

dling or controlling violent or alcoholic patients, answering emergency calls (referred to as Stat calls), and doing heavy lifting of oxygen tanks, orthopedic and bedfast patients, and other objects.

In determining whether these differences existed and whether they are significant we focus on the differences that the district court found to exist: sterile procedures, lifting heavy patients, controlling unruly patients, "stat" calls, free time, setting up traction, obtaining oxygen tanks, removal of casts, and postmortem tasks.

### STERILE PROCEDURES

The district court, apparently relying solely upon the testimony of the hospital administrator, made the following finding of fact concerning the performance of sterile procedures:

> At all times, orderlies have been trained in Sterile Techniques, which requires [sic] substantial skill, and includes [sic] catheterization, catheter irrigation, rectal suppositories, TUR dressing change, and bladder irrigation. Since October of 1968, aides have received no training in Sterile Techniques. A typical orderly in a typical day, would perform from five to seven catheter irrigations varying from five minutes to 45 minutes each, and would perform a catheterization upon a male patient five or six times in a day, requiring twenty-five to thirty-five minutes each. These are skilled procedures. Almost all catheter irrigations and catheterizations upon the patients are performed by orderlies. Upon female patients almost all of these procedures are performed by Registered Nurses or Licensed Practical Nurses, and very rarely, if ever, by aides.

A careful examination of the record demonstrates that this finding of the district court is clearly erroneous in a crucial respect: until October 5, 1972, aides performed virtually all catheter irrigations and catheterizations of females.

Although the hospital administrator did testify that aides have not received training in sterile techniques since 1968 and that in October, 1968, a directive was issued commanding that aides previously trained to do catheterizations should cease doing them, he also admitted that aides might have continued to do these sterile procedures after 1968. The reason for this change of policy, he explained, was that a number of doctors wanted sterile procedures to be performed only by professional medical personnel, that is, by Registered Nurses and Licensed Practical Nurses, not by nonprofessional aides.[9] The hospital administrator also testified that at least six orderlies, three in the x-ray section of the hospital, two in physical therapy, and one in central supply, performed no sterile procedures at all.

Despite the hospital's decision to discontinue the training of new aides to do sterile procedures, and despite the hospital's announced policy not to permit aides already trained to perform these tasks, the 1969 job bulletin for aides, effective until 1972, listed "sterile procedures" including catheterizations and catheter irrigations as duties. More importantly, aides Catherine Bryant, Dorothy Crump, Elizabeth Wilhite, Josephine Hatfield, Mary Pauline Wathen, and Ruby Davis; Licensed Practical Nurse Susan Wink; and Registered Nurses Norma Ward, a unit supervisor, and Katherine Wathen, the evening supervisor of the hospital, all testified that aides previously trained continued to do sterile procedures on a regular basis until a few weeks before the commencement of trial. The sterile procedures performed by aides on a regular basis until just prior to trial included catheterizations, catheter irrigations, bladder installations and irrigations of females, and reinforcement

---

9. It is anomalous that the concern of the hospital did not extend to male patients who, of course, were catheterized and had other sterile procedures performed upon them by non-professional orderlies.

of dressings and eye soaks. Even after the new October, 1972, directive was issued, ·one aide, relying on it, was reprimanded when she failed to do a catheterization ordered by a License Practical Nurse and was instructed to obey any future orders.

In light of this evidence, we hold that the finding of the district court that aides rarely, if ever, performed sterile procedures, particularly catheterizations and catheter irrigations, until the commencement of trial, is clearly erroneous.[10]

## LIFTING HEAVY PATIENTS

The district court, in its general finding of fact, apparently concluded that aides did not have the duty of lifting heavy patients, because it indicated that this task was one that distinguished the duties of orderlies from those of aides. The evidence, however, indicates that, as a rule, aides and orderlies helped each other to lift heavy patients. Dorothy Crump, an aide, testified that although an orderly usually assisted a patient in getting on his crutches and *helped* to weigh heavy patients, she would sometimes summon an aide and sometimes an orderly to *assist her* in lifting a heavy patient. Elizabeth Wilhite, an aide, testified that she needed help almost daily in lifting héavy patients and that she would call either an orderly or an aide to *assist her.* Josephine Hatfield, an aide,

testified that orderlies usually *helped her* to lift heavy patients but that if an orderly were not available, she would obtain assistance from another aide. Although orderlies single-handedly lifted heavy patients, particularly when bathing male patients, aides also lifted female patients single-handedly except when they were either extremely heavy or uncooperative.[11]

We hold, therefore, that the finding of the district court that orderlies but not aides lifted heavy patients is clearly erroneous.

## STAT CALLS

In contrasting the assignments of aides and orderlies, the district court found that:

[t]he typical aide is assigned to a fixed number of patient rooms, and number of patients therein, at an assigned duty station. The typical orderly is not assigned to any one duty station, or even to one certain floor, but is required to answer calls throughout the hospital, known as Stat calls, many of which arise from emergencies. The orderly is free from supervision and must exercise discretion and decision making in determining whether to respond and go to a call at another location, or to continue the performance of the duty upon which he is then en-‍gaged. The Stat calls frequently re-

10. Since at least six orderlies performed no sterile procedures, and a number of aides did perform these tasks, we need not decide whether the district court was correct in its determination of the number of catheterizations and catheter irrigations that a typical orderly performed on a typical day, and the time required to perform them. We observe, however, that the minimal evidence introduced respecting this question came primarily from an orderly who contradicted himself not only about the number of catheter irrigations and catheterizations he performed each day, but also about the length of time it took him to perform them. Although testifying that he did perhaps five or six catheterizations each day, he also admitted that sometimes he did only two or three Foley catheterizations each week; that a Foley probably took him longer than other kinds of catheterizations, and that a Fo-

ley catheter could be inserted in only ten minutes. And, although he testified that it might take him as long as 45 minutes to do a catheter irrigation, he recalled having told counsel for appellant that a Foley irrigation many times took only a few seconds. The other orderlies did not indicate how often they performed, or how long it took them to perform sterile procedures, and one of them stated that he did nothing that aides did not do.

11. One aide who worked in the obstetrics section of the hospital testified that she was often required to lift patients who were paralyzed from the waist down. In 1971, she received the "special wage" of $2.25 per hour. This was, however, still twenty cents less per hour than the wage received in 1971 by orderlies with only nine months experience.

quire the orderly to hurry to meet an emergency, upon which not infrequently life itself depends.

This finding of the district court gives the impression that the orderlies were constantly hurrying about the hospital in response to stat calls, and that patient lives often depended upon their prompt response. The evidence, however, affords little support either for the district court's finding or for the inferences that could be drawn from the finding. Denford Morris, an orderly, testified that he was assigned to the third floor, specifically to two stations on that floor, and that he received approximately one stat call per week, and that the last stat call he had received was approximately two weeks before. The purpose of this call, he thought, was "probably" to take a patient to the coronary care unit, but by the time he had arrived four or five other orderlies were already present, so that he was not needed. He also testified that he received stat calls to do catheterizations of males. Kenneth Thomasson, an orderly from 1969 to 1971, testified that he had been assigned to the third floor most of the time; that he went to other floors in response to stat calls, but that aides were already present by the time he arrived. Norma Ward, a registered nurse and a unit supervisor, testified that orderlies received stat calls "pretty often" but that many of these calls were occasioned by a male needing to use a urinal or to be catheterized. Katherine Wathen, the evening supervisor of the hospital, testified that orderlies rarely received stat calls on her shift and rarely received two stat calls at once. When one did receive simultaneous calls, she indicated that he usually made up his own mind about where to go first. However, Susan Wink, a registered nurse, testified that when stat calls were made, the station where the orderly was working would call the station initiating the call, ask the purpose of the call and whether the orderly was needed immediately.

Although aides do not have to respond to stat calls and rarely have to "travel" (one aide testified that she had traveled several times the previous week), aides do have to respond to lights turned on by patients for any number of reasons. Catherine Bryant, an aide, testified that aides have to answer lights all the time, that sometimes there are not too many, that at other times they are going on right up until the time their shifts end, and that still at other times answering patient lights required them to work past the time their shifts ended. She also testified that when patients turned on their lights, they usually wanted a bedpan, or medication for pain, and that males often wished to use a urinal. When an aide received the last-mentioned request, she would initiate a stat call if an orderly were not available on the floor, and if he were occupied elsewhere in the hospital and could not come to assist the male patient, the aide would assist him herself. Elizabeth Wilhite, who worked in the orthopedic section of the hospital, also testified that patient lights were turned on frequently and that it was not unusual to have four or five patient lights go on all at once on her station. It should also be observed that when an aide sees two lights go on simultaneously, she has to choose which to respond to first, and that her decision takes into account the nature of the patient's illness and the urgency of his circumstances.

In light of this evidence, we conclude that the district court's finding that the typical orderly, in contrast to the typical aide, was not assigned to one floor and that he frequently had to hurry in response to stat calls in order to meet an emergency upon which life not infrequently depended, is clearly erroneous. To the extent that the district court found that orderlies had to meet emergencies while aides did not, we find that this is also clearly erroneous because the record demonstrates that aides had to respond to lights, that as a consequence of these lights they sometimes initiated stat calls, and that aides were already present by the time an orderly arrived after being paged. Therefore, to the ex-

tent that orderlies responded to emergency situations, aides did also.

## FREE TIME

The district court found that:

[t]he work of the orderlies is continuous, demanding and tiring, and the emergency calls are frequently hard on the nerves of the orderly. The orderly has very little time for rest or relaxation during his working time. The aides perform work under much less tension and strain, and have more opportunity for rest and relaxation during the work day.

There was very little testimony given regarding the amount of free time aides and orderlies have. The little testimony that there was, however, indicates that aides have less free time than do orderlies. Although orderlies have regularly scheduled duties and do have to respond to stat calls approximately one time a week, aides seem to be in virtually continuous motion making beds, serving trays, giving baths, performing sterile procedures, cleaning equipment, and a host of other activities, including responding to patient lights. Kenneth Thomasson,[12] an orderly, testified that he did have free time although the amount varied with the shift he was working on. On the day shift, he had very little free time, from "three to eleven you have slack times on up in the night and eleven to seven you've got a lot of slack time." Denford Morris, who worked on the day shift, testified that orderlies might have a little free time sometimes. Dorothy Crump, an aide, testified that aides don't have much free time. Katherine Wathen, the evening supervisor of the hospital, testified that orderlies have more free time than aides do.

In light of this testimony, we conclude that the district court's finding that aides have more free time than orderlies do is clearly erroneous. The evidence indicates at a minimum that aides and orderlies have approximately the same amount of free time, and it may fairly be said that the evidence indicates that orderlies have more free time than aides do.

We conclude, contrary to the district court, that the differences in wages paid to the orderlies and aides cannot be justified by its finding that orderlies alone performed the additional duties of removing casts, setting up traction, and carrying oxygen tanks from the basement. These additional duties were not performed by all orderlies and consumed only a negligible portion of the workday of those orderlies who undertook them. *See, e. g., Brennan v. Prince William*

---

12. The only testimony about the tension under which non-professional assistants to the nursing staff worked was given by Kenneth Thomasson, who stated in response to questioning:

Q. Why did you leave the hospital?
A. Looking for a better job.
Q. You didn't like the work out there?
A. I liked it as well but it was hard on my nerves.
Q. Why was it hard on the nerves?
A. I just got too involved with the people, I guess.
Q. Uh, you got "stat" calls?
A. Yes, sir.
Q. Did you have to hurry when you got 'em?
A. Yes, sir.
Q. When you got there did you find people in trouble sometimes?
A. Yes, sir.
Q. Was that hard on your nerves?
A. Well, the rush is; right at the time you have—uh, it's happening it doesn't bother you so much and then after it's over with I think about it, it kind of bothers.

The foregoing testimony, in response to leading questions, suggests that Thomasson may be a sensitive person more troubled seeing patients who were very ill than by having to respond promptly to stat calls. He subsequently became employed at a doughnut shop.

No aide testified directly about the tension resulting from responding to patient lights and performing other duties, although one aide stated that sometimes she was kept running all day. The imprecise testimony about tensions particularized to orderly Thomasson, and the absence of testimony about tensions experienced by the typical orderly and aide, demonstrates that the finding that aides "perform work under much less tension" than orderlies do is without evidentiary support and therefore clearly erroneous.

*Hospital Corp.,* 503 F.2d 282 (4th Cir. 1974), *cert denied,* 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975), *Hodgson v. Behrens Drug Co.,* 475 F.2d 1041 (5th Cir.), *cert denied,* 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973), *Hodgson v. Fairmont Supply Co.,* 454 F.2d 490 (4th Cir. 1972), *Shultz v. American Can Co.— Dixie Products,* 424 F.2d 356 (8th Cir. 1970), *Shultz v. Wheaton Glass Co.,* 421 F.2d 259 (3d Cir.), *cert denied,* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). The last three cases were cited with approval by the Supreme Court in its recent decision *Corning Glass Works v. Brennan, supra,* at n.24.

The testimony regarding these additional tasks is as follows:

## REMOVAL OF CASTS

The district court found that:

[t]hroughout the hospital, but particularly in the orthopedic section, the typical orderly exercises the skill of cutting a cast where the physician has directed, and the orderly is trained by the physician to do this. There is no evidence that the aide is trained at all to do this, or ever performs this function. The cutting of casts requires a different and additional skill by the orderly.

We agree with the district court that there is no evidence in the record to indicate that an aide has ever cut a cast at the direction of a physician. However, there is also no evidence to support his finding that a typical orderly exercises the skill of cutting casts with any regularity. Orderlies stationed in the orthopedic section may do this on a somewhat regular basis, but these orderlies can not be considered typical. Denford Morris, an orderly who has been assigned to the third floor since 1967 or 1968, testified that he had cut only one cast from that time until the time of trial. The other orderlies who testified did not indicate whether they had ever cut a cast. In addition to holding that the district court's finding that a typical orderly exercises the skill of cutting a cast is clearly erroneous, we also hold that the cut-

ting of one cast over a period of four or five years does not sufficiently distinguish the jobs of aides and orderlies to justify a pay differential. *See, e. g., Hodgson v. Behrens Drug Co., supra, Hodgson v. Fairmont Supply Co., supra, Shultz v. American Can Co.—Dixie Products, supra.*

## TRACTION

The district court found that:

[w]hen traction is required to be set up in the hospital, the typical orderly assigned must know the various types of traction, and how to set up the apparatus, and routinely perform this function. The aide may from time to time take a patient in or out of traction, add or remove weights; but does not have the knowledge or exercise the skill just described for the orderly. In addition to the skill, the setting up of traction requires the lifting of heavy weights and requires substantial exertion by the orderly.

The record does indicate that the usual practice at the hospital is for orderlies to set up traction, when necessary, and for aides to change the weights on traction and to take patients in and out of traction for exercise. Denford Morris, an orderly who worked on the surgical floor, stated, however, that he set up traction only infrequently. His estimate varied from an average of once or twice a month to a possibility of two to three times a week. He testified that it might take as long as thirty minutes to get the equipment from the orthopedic section of the hospital, set it up and place the patient in it. Norma Ward, a supervisor of the medical unit, testified that in her section, orderlies set up traction; but that her section required traction equipment only on an irregular basis, approximately two or three times per month. Kenneth Thomasson, an orderly who worked on the medical floor of the hospital, also testified that traction equipment was needed only infrequently, that he rarely set up traction, and that aides sometimes helped him do it. Appellees

also elicited the following testimony from him:

Q. And you have to know what kind of traction to get and what you're doing to set it up, don't you?

A. Right.

Q. And Aides don't do—don't know that, do they?

A. Well, most of 'em know more about it than I did.

Perhaps the most revealing testimony about the ability of some aides to set up traction, and whether, in fact, they performed this task, came from Elizabeth Wilhite, an aide who had been assigned to the orthopedics section of the hospital for thirteen years:

Q. Uh, describe how your work involves traction?

A. Well, naturally, I put it on, and when I first started there, I'd trail along after Mike Livers uh, he's an Orderly that has retired, 'till I learnt traction, because I wanted to learn, and I've set up traction such as Buchs Traction and such as cervical traction, but now, the Ninety-nine Traction, I've never done that because it's not ordered too often. I think it's been ordered once or twice since I've been there.

Q. Have you ever had occasion to show anyone else how to do traction?

A. Yes, sir.

Q. Uh, who?

A. Jim Johnson, a little Orderly that came in—it hasn't been too long—too many weeks ago, and he was on our station the other afternoon and our regular Orderly wasn't there.

Q. When was this?

A. This was about a week before last, or two weeks ago; something like that.

Q. Okay; and what happened?

A. Well, I was told to go back and show him and help him, how to put this traction on.

Q. Uh, who told you to do that?

A. An RN.

On cross-examination by appellees, Elizabeth Wilhite gave the following testimony:

Q. Now, when was the last time that you set up traction; you got the equipment and you set it up, a Buchs Traction or a cervical traction?

A. This was a Buchs Traction.

Q. When was the last time?

A. It was about a week and a half ago . . .

Q. Now then, who—what classification uh, is it Orderlies who set up that traction, nearly all of those tractions?

A. Yes, sir.

Q. It is not the Aides that set up that traction, are they? It is the Orderlies?

A. Well, we help with it. You mean these big frames that you pack and put over the beds; yes, sir; we help the Orderlies. They could not do it by themselves, no more than we could do it by ourselves.

Q. Are they heavy?

A. Yes, they're heavy.

Q. Does—which one is the one that has the responsibility of doing the lifting and doing the heavy work, the Aide or the Orderly?

A. Well, the Orderly is on one end of the frame and we're on the other end of the frame.

Q. And you [do] just as heavy work as the Orderlies; is that what you're telling?

A. I would have to.

Q. Are you telling the Court that that's what you're doing?

A. I would have to lift as much as he did. If we—if I didn't, the frame would go down on my side.

Q. Do you lift up the bed and put it on blocks sometimes in setting up that traction?

A. I have helped lift up the beds, yes, sir; and I have helped also put the blocks under them.

She also testified that there was at least one other aide in the orthopedics section who had set up traction.

In light of the foregoing testimony, we conclude that orderlies set up traction on such an infrequent basis that this duty cannot justify a higher wage. We also conclude that because there were aides who were also qualified to perform this duty, this task cannot be regarded as a distinguishing characteristic of the job of orderly. *See, e. g., Brennan v. Prince William Hospital Corp., supra, Hodgson v. Behrens Drug Co., supra, Hodgson v. Fairmont Supply Co., supra, Shultz v. American Can Co.—Dixie Products, supra, Shultz v. Wheaton Glass Co., supra.*

## OXYGEN TANKS

The district court, in distinguishing the jobs of aides and orderlies, found that orderlies brought heavy oxygen tanks from the basement of the hospital, and, by negative implication, found that aides did not. The record indicates that as a general rule, orderlies brought oxygen tanks from the basement when necessary and that aides started the oxygen. However, all rooms in the hospital were equipped with oxygen, and the only time that it was necessary to bring oxygen tanks from the basement was when the hospital had an overflow of patients who were placed in the halls and needed oxygen. None of the orderlies who testified indicated that he had ever brought an oxygen tank from the basement. Moreover, it appears that aides were able to perform this task. Aides Josephine Hatfield and Susan Wedding both testified that they had procured oxygen tanks from the basement when necessary.

Accordingly, we determine that although orderlies may have carried oxygen tanks from the basement, the task was an infrequent one that aides were also capable of performing. Accordingly, this duty does not significantly distinguish the job of aides and orderlies, and does not justify higher wages for orderlies.

## UNRULY PATIENTS

The district court found that:

[t]he hospital has two rooms for violent patients, and these rooms are almost always in use. In addition, the hospital from time to time has alcoholic, narcotic, and other patients who are not routinely safe to themselves or other patients or personnel. The orderly has the responsibility for almost all care to those patients, which is performed under a less satisfactory working condition.

In so finding, the court apparently relied upon the testimony of the hospital administrator and that of Denford Morris, an orderly. However, although the hospital administrator testified in his deposition that orderlies are responsible for restraining violent patients and for sitting with patients "who are in custody of the law, where an aide does not," he also conceded that aides might assist orderlies in restraining patients on occasion. Denford Morris testified that unruly and violent patients are kept in special rooms and that orderlies have to "go down and help restrain them . . . ." When he was asked how often he had been required to do this, he testified that "it doesn't happen real often with us . . . . [M]aybe a time or two or such matter [each month]." He also testified that most of the time the lock-up rooms are in use, and that most of the nursing care to patients in these rooms was "probably" given either by an orderly or someone assisted by an orderly.

This testimony, however, was contradicted by Ruby Davis, an aide assigned to a station with a lock-up room, who was the only person whose testimony regarding the nursing care actually performed was based upon direct knowledge. She testified that she handled unruly patients about once each week, assisted by whoever was available, including aides, orderlies and supervisors. She added that when she performed services for these patients, such as taking blood pressure, an orderly or sometimes an aide would stand guard. Catherine

Bryant, an aide, testified that aides summoned orderlies *to assist them* in restraining patients *only if* they became very unruly; that aides and orderlies worked together in restraining violent patients; and that during her fifteen years at the hospital she never saw an orderly get into a "scuffle" with a patient. Aide Dorothy Crump testified that when her patients became unruly she would sometimes summon an aide and sometimes an orderly to assist her. Finally, Josephine Hatfield, an aide, testified that orderlies did not look after violent patients more than aides.

Our examination of testimony of both aides and orderlies convinces us that there is insufficient, if any support, for the finding that orderlies performed most of the nursing care for unruly patients. Even if some orderlies were exposed more often to dangerous patients than some aides were, the orderlies' exposure to greater risk did not occur with sufficient frequency or take up a sufficiently large portion of their working day to entitle them to a higher wage. We agree with the court in *Brennan v. Prince William Hospital Corp., supra,* at 286, that "[h]igher pay is not related to extra duties when . . . [t]he extra task consumes a minimal amount of time and is of peripheral importance."

## POST–MORTEM TASKS

The district court found that:

[a]n unpleasant task at the hospital is post-mortem care. This is done by aides and orderlies; but because the hospital has many more aides than orderlies, this unpleasant duty falls much more frequently upon the typical orderly, than the typical aide . . . . The orderly performs all post-mortems on the male deceased patients; and the aides share in turn the post-mortem care upon deceased female patients.

The evidence indicates, that, as a general rule, orderlies did post-mortem work on deceased males, and aides, on deceased females. Since aides outnum-

bered orderlies six to one, it would appear that orderlies were likely to perform more post-mortems than aides. However, none of the orderlies who testified indicated that he had ever done post-mortem work. Moreover, Elizabeth Wilhite testified that although she performed post-mortems, she, like other aides, also assisted orderlies in doing post-mortems and that she usually performed only one post-mortem each month.

Despite the paucity of evidence presented concerning the division of post-mortem tasks between aides and orderlies, it is clear that both did such work. The evidence does not support the district court's finding that there was always a division of post-mortem procedures based upon the sex of the deceased. Accordingly, we conclude that any greater frequency with which orderlies may have performed this work does not support a determination that for this reason the job of orderly required greater skill, effort, or responsibility, or was performed under different working conditions. "Disproportionate frequency in the performance of the same routine tasks does not make the job unequal." *Brennan v. Prince William Hospital Corp., supra,* at 287, citing 29 C.F.R. § 800.123 (1973).

On the basis of the evidence that we have already discussed, we hold that the general finding of fact made by the district court that a

typical orderly . . . spends substantially all of his working time in performing Sterile Techniques, including catheterizations, lifting heavy patients, changing TUR dressing, setting up Tractions, handling or controlling violent or alcoholic patients, answering emergency calls (referred to as Stat calls), and doing heavy lifting of oxygen tanks, orthopedic and bedfast patients, and other objects

is clearly erroneous. In fact, some orderlies performed no sterile procedures at all and the "typical" orderly spent little time lifting heavy patients, setting

up traction, handling unruly patients, responding to stat calls, and lifting oxygen tanks and other heavy objects. Indeed, none of the orderlies who testified indicated that he had ever carried an oxygen tank from the hospital basement or had changed a TUR dressing.

Although the district court determined that aides spent substantially all of their working time in "routine patient care," the record demonstrates that this *routine* care included performing sterile procedures, particularly catheterizations, catheter irrigation, bladder installation and irrigation; lifting heavy patients; caring for violent and potentially violent patients; and answering emergency calls in the form of patient lights. Moreover, the record demonstrates that some aides transported oxygen tanks from the hospital basement and set up traction.

Orderlies also were required to perform "routine" tasks. For example, Denford Morris, who was assigned to two stations of the third floor of the hospital on the seven a. m. to three p. m. shift, testified that his first task each morning was to ascertain what linen was needed on the third floor that day, to bring it from the basement, and to distribute it in appropriate closets on the third floor. This task required no special skill, effort, or responsibility. Then he took the eight a. m. rectal temperatures of the male patients on his two stations and performed a number of other nursing duties including giving enemas, irrigating catheters, inserting catheters, giving sitz baths, finishing baths on male patients, walking patients, inserting suppositories, taking eleven a. m. temperatures, and helping to distribute lunch trays. Kenneth Thomasson, a former orderly, testified that he made six or seven beds each day when he worked on the morning shift.

On the afternoon shift, the evidence indicates that neither aides nor orderlies were required to bathe patients or change beds unless a patient was discharged from the hospital or had soiled his bed. If a male patient soiled his bed, an orderly had the responsibility of cleaning up, and if the patient were female, an aide did. Aides took temperatures and blood pressures, assisted patients to the bathroom, reinforced dressings, irrigated bladders, performed sterile soaks for cataract patients, regularly turned patients and got them out of bed, distributed dinner trays, prepared patients for surgery, and until October, 1972, inserted catheters. All of these duties, with the exception of distributing dinner trays, were performed for male patients by orderlies.

Aides and orderlies on the night shift did not generally perform scheduled nursing procedures, but spent most of their time attending to the specific needs of patients by, for example, answering calls, helping them out of bed and assisting them to the bathroom. Both also performed assigned duties, including, for example, inserting catheters, giving douches, unstopping catheters to take tests, and clamping catheters off.

The record demonstrates that at least those aides who were trained to, and did perform sterile procedures, fulfilled duties that required skill, effort and responsibility substantially equal to that required by orderlies, and performed them under substantially identical working conditions. In making this determination, we observe that the district court made no finding and, indeed, could not make a finding on the record before him, that the duties that in his view distinguished the job of orderly from that of aide were performed by *all* orderlies. Nor did he find that the orderlies who did perform them did so with sufficient frequency to justify a higher wage. In fact, we are unable to find any evidence that any orderly performed any duty not also performed by an aide with three legally insignificant exceptions: (1) the transportation of linen from the basement; (2) the infrequent removal of casts; and (3) the duty of responding to "stat" calls. The first exception requires no special skill, effort, or responsibility and does not justify the higher wages paid to orderlies. The second, was apparently performed only once during a

four or five year period by a "typical" orderly. In order to justify higher wages, this duty would have to be performed with some regularity and would have to consume a substantial portion of an orderly's work day. The third, is not only an infrequent duty, but it is also not essentially different from the aide's corresponding duty of responding to patient lights.

◼ Our interpretation of the Equal Pay Act corresponds to that of the agency charged with its enforcement. Although agency interpretation is not controlling,[13] it is entitled to great weight, and in this instance we find it well-reasoned and persuasive. In 29 C.F.R. § 800.128 (1974), the Secretary of Labor has promulgated an interpretive bulletin providing that:

> . . . the occasional or sporadic performance of an activity which may require extra physical or mental exertion is not alone sufficient to justify a finding of unequal effort . . . . [However,] a wage differential might be justified [if] . . . the extra effort so expended is substantial and is performed over a considerable portion of the work cycle.

This construction has been consistently adopted by courts in interpreting the equal pay provisions of the Fair Labor Standards Act. *E. g., Shultz v. American Can Co.—Dixie Products,* 424 F.2d 356 (8th Cir. 1970); *Hodgson v. Montana State Board of Education,* 336 F.Supp. 524 (D.Mont.1972). *See also Shultz v. Wheaton Glass Co.,* 421 F.2d 259 (3d Cir. 1970), *cert. denied,* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970), *on remand,* 319 F.Supp. 229 (D.C.N.J.1970). In *American Can Co.,* the court held that males who performed substantially the same work as females but in addition

thereto spent from 2 to 7% of their work day doing heavy lifting were not entitled to wages higher than those paid to the females. In the *Montana State Board of Education* case, the court found that the employer violated the Equal Pay Act when it paid female housekeepers wages lower than those paid to male custodians, even though both groups spent the predominant part of their workdays engaged

> "in routine custodial duties consisting of sweeping, mopping, washing, scrubbing, dusting, and cleaning of bathrooms . . . [because the] so-called 'extra duties' performed by the . . . men either took only minutes per day or per week, or [were] also performed by the women . . . ." 336 F.Supp. at 525.

In the *Wheaton Glass* case, the court found that even if all male selector-packers performed all 16 additional tasks that their employer stated consumed 18% of their working day, because the additional tasks were not shown to be of greater economic value than those performed by females, they did not justify payment of higher wages to the male selector-packers than to the females.

The cases challenging differentials between wages paid to hospital orderlies and aides have applied the principle that differences between duties must be substantial in terms of effort required, and time devoted. In the cases where the wage differences were upheld, the evidence demonstrated that orderlies regularly performed duties that aides were not required to perform, and that the orderlies were required to employ either greater skill, effort or responsibility than the aides. *E. g., Hodgson v. Golden Isles Convalescent Homes, Inc.,* 468 F.2d 1256 (5th Cir. 1972), and *Hodgson v. Good*

---

13. In 29 U.S.C. § 206(d), Congress did not authorize the Secretary of Labor to promulgate binding regulations, and the bulletin with which we are concerned appears in 29 C.F.R. Subchapter B, entitled "STATEMENTS OF GENERAL POLICY OR INTERPRETATION NOT DIRECTLY RELATED TO REGULATIONS." However, when the Secretary's interpretation of the Act does not contravene the intent of Congress, it is entitled to great deference. *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), *Brennan v. City Stores, Inc.,* 479 F.2d 235 (5th Cir. 1973). *See also Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

*Shepard Hospital,* 327 F.Supp. 143 (E.D. Tex.1971).[14]

In *Golden Isles Convalescent Homes,* the hospital employed one to four orderlies who performed a number of tasks not performed by its thirty to forty aides, including the insertion of catheters for male patients, total lifting, irrigation, setting up traction, the pursuit of missing patients, the driving of patients, setting up oxygen tanks, and "floating" throughout the hospital. The court of appeals expressly rejected the contention that the record demonstrated that "these duties were performed by aides, that they did not differ greatly from aides' other duties, and that they were performed *too* infrequently to justify a conclusion that the work was unequal." 468 F.2d 1257.

In the *Good Shepard Hospital* case, the district court found that orderlies performed a number of tasks not performed by aides including assisting the orthopedic surgeon, catheterizations, and emergency room work; that they, unlike aides, were responsible for the security and protection of hosptial personnel, patients and visitors, for the restraint of patients in the hospital's lock-up rooms, and for fire and disaster drills; that they, unlike aides, were not assigned to particular floors but performed hospital-wide services and were required to respond to emergency calls; and that they spent up to twenty-five per cent of their working day doing heavy lifting and loading, and in ambulating patients.

In contrast, in the cases in which courts have invalidated separate wage scales for aides and orderlies, the evidence demonstrated that both performed substantially equal work, and that any differences in the duties did not justify higher wage rates for males. *E.g., Hodgson v. Brookhaven General Hospi-*

*tal,* 436 F.2d 719 (5th Cir. 1970), appeal after remand, 470 F.2d 729 (5th Cir. 1972); *Hodgson v. Maison Miramon, Inc.,* 344 F.Supp. 843 (E.D.La.1972); *Hodgson v. George W. Hubbard Hospital of Meharry Medical College, Inc.,* 351 F.Supp. 1295 (M.D.Tenn.1971).

In the *Meharry Medical College* case, the court, in awarding back pay to nurse aides, rejected the hospital's assertions that higher wages to males were justified because male "nurse attendants" performed additional duties including mopping floors, transporting bodies to the morgue, assisting undertakers in the release of bodies from the morgue, moving helpless patients in and out of bed, transporting large gas cylinders, delivering heavy supplies to the wards, changing mattresses, transporting stretcher patients, and carrying out temporary emergency duties in areas of the hospital other than the station to which they were assigned. Instead, the court found, that aides and orderlies assisted each other in these tasks, and that emergencies requiring special efforts by orderlies alone arose only occasionally.

In the *Maison Miramon* case, *supra,* the district court found that the defendant nursing home had violated the Equal Pay Act by paying higher wages to orderlies than were paid to aides when both

. . . are generally responsible for the personal care and comfort of the Greenbriar patients and are usually assigned to the care of female and male patients, respectively. The basic duties of each include the feeding of patients, brushing and combing their hair; making beds; changing, turning, and lifting patients; securing and emptying bed pans; and assisting patients in and out of bed. When needed, and as available, the aides and or-

---

14. See also *Shultz v. Royal Glades, Inc.,* 66 CCH Lab Cas. ¶ 32,548 (S.D.Fla.1971), where the court, in rejecting a challenge under the Equal Pay Act, found that orderlies spent 50 to 60 percent of their time lifting patients who were too heavy for a single aide; 20 percent of their time lifting heavy patients for aides upon request; and procured heavy oxygen tanks, carried patients' luggage, and cared for difficult-to-handle patients. In addition, orderlies, unlike aides, were required to work split shifts from 6:00 a. m. to 1:00 p. m. and then from 5:00 p. m. to 8:00 p. m.

derlies assist each other. 344 F.Supp. 845.

In *Brookhaven General Hospital, supra,* the court of appeals reversed the initial decision of the district court finding a violation of the Equal Pay Act. In seeking reversal, the hospital contended that although aides and orderlies were primarily responsible for the routine care of patients assigned to them,

> . . . orderlies were frequently called upon to perform general hospital duties which aides were rarely called upon to perform—duties requiring more than routine skill (catheterizations), effort (lifting heavy patients, bringing in stretcher patients, setting up traction, helping in the application of heavy casts, subduing violent patients, holding patients down in uncomfortable positions during spinal taps, moving TV sets and other heavy equipment, assisting in the emergency room, bringing up supplies), and responsibility (maintaining hospital security and preparing to assume leadership in the event of a fire). 436 F.2d at 723.

The court of appeals remanded to the district court for specific findings of fact whether these additional tasks required 1) extra effort, 2) a significant amount of the time of all orderlies, and 3) were of an economic value commensurate with the pay differential. The district court found the jobs of orderlies and aides required an equality of effort, and the court of appeals affirmed. It held that "the record supports the affirmative statement that orderlies and aides expended substantially equal effort in performing all of their duties, however divided and ranked." 470 F.2d 730.

Finally, in *Brennan v. Prince William Hospital Corp., supra,* the court reversed a judgment for the hospital entered after trial because it determined, as we do in this case, that the district court misapprehended the standard to be applied in cases alleging violation of the Equal Pay Act. In its opinion, the court held that the higher wages paid to orderlies were not related to additional duties assigned to them, because some orderlies received the higher wages without performing these duties, because some of the additional duties (restraining patients, providing physical security) were performed only infrequently, because aides performed some of the same tasks (heavy lifting, restraining patients), and because some of the additional duties required no extra skill, effort or responsibility (heavy lifting, "floating").

In the appeal before us, the district court did find that the duties of orderlies required greater skill, effort and responsibility. This legal conclusion is, however, based both upon findings of fact that we have held are clearly erroneous and also upon an incorrect interpretation of the Equal Pay Act. Appellant has demonstrated that the aides who performed sterile procedures through October 1, 1972, were required to have substantially the same skill, to exert substantially the same effort, and to assume substantially the same responsibilities under identical working conditions as orderlies. Therefore, these aides are entitled to the same wages as orderlies for that period unless appellees can demonstrate on remand that the higher wages paid to orderlies were based on a factor other than sex.

 This determination, however, does not terminate this litigation, because appellees are entitled to an opportunity to rebut the Secretary's prima facie case, and to show that a factor other than sex including, for example, "(i) a seniority system; (ii) a merit system; [or] (iii) a system which measures earnings by quantity or quality of production," 29 U.S.C. § 206(d)(1), explains the differential in wages paid to aides and orderlies.[15] In remanding this case to

---

15. The enumerated exceptions to the rule requiring equal pay for substantially equal work are affirmative defenses. *Corning Glass Works v. Brennan,* 417 U.S. 188, 196, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

Even before the Supreme Court's decision federal courts uniformly treated the enumerated exceptions as affirmative defenses, which need not be anticipated by the Secretary. *E. g., Hodgson v. Brookhaven General Hospital,*

the district court for further proceedings, we observe that the burden of proving that a factor other than sex is the basis for a wage differential is a heavy one. We agree with the Secretary that "unless the factor of sex provides no part of the basis for the wage differential," the requirements for an exception are not met. 29 C.F.R. 800.142 (1974). This standard was adopted in *Hodgson v. Security National Bank,* 460 F.2d 57 (8th Cir. 1972), where the court found that no bona fide management training program existed that would justify paying male bank tellers wages higher than those paid to female bank tellers, and rejected the bank's unsubstantiated generalization that "women characteristically had been uninterested in management positions." 460 F.2d 60.

Other courts have also rejected an asserted defense based on preconceived notions of what constitutes "women's work" and "men's work." In *Hodgson v. Fairmont Supply Co.,* 454 F.2d 490 (4th Cir. 1972) the court, in reversing a judgment for the employer, found that the Secretary of Labor had sustained his burden of proving that the jobs performed by the company's single male employee and the three female employees at its stock desk required substantially equal skill, effort and responsibility and that the sixteen additional tasks performed by the male did not justify paying him a higher wage. In addition, the court refused to recognize "a training program coterminous with a stereotyped province called 'man's work' as a factor other than sex." 454 F.2d 498.

■ Moreover, although a bona fide job classification program that does not discriminate on the basis of sex is a defense to a charge of discrimination, H.R. Rep.No. 309 (1963), 1963 U.S.Code Cong. and Admin.News, pp. 687, 689, on re-

mand, consideration should be accorded to the hospital's own job descriptions. It admitted at trial that it had never hired a woman for the position of orderly because no woman had ever applied for the position. However, the hospital's own description of the two jobs, for "nurse assistant" and for "male nursing assistant," as an orderly is formally designated, may evidence an official hospital policy against hiring women as orderlies. In making this observation, of course, we do not intend to encroach upon the responsibility of counsel or upon the province of the district court.

Because of the errors heretofore pointed out, including the dismissal of the complaint at the close of appellant's evidence, the judgment of the district court is reversed and the cause is remanded for further proceedings.

436 F.2d 719 (5th Cir. 1970), *Shultz v. Wheaton Glass Co.,* 421 F.2d 259 (3d Cir.), *cert denied,* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). As the district court pointed out in *Wirtz v. Wheaton Glass Co.,* 284 F.Supp. 23, 33 (D.N.J.1968), *rev'd on other grounds sub nom. Shultz v. Wheaton Glass Co., supra,*

". . . in the Upper House, the Chairman of the Senate Subcommittee, who guided the Bill through that body, declared that an employer who interposes a defense of exception to coverage assumes the burden of proving that it comes within the exceptive provisions of the Act."